712 F.2d 611
 26 Wage & Hour Cas. (BNA) 404, 229 U.S.App.D.C. 297,
98 Lab.Cas. P 34,403,
31 Cont.Cas.Fed. (CCH) P 71,368
 BUILDING & CONSTRUCTION TRADES' DEPARTMENT, AFL-CIO, et al.
v.
Raymond J. DONOVAN, Secretary of Labor, et al., Appellants.
BUILDING & CONSTRUCTION TRADES' DEPARTMENT, AFL-CIO, et al.,
Appellants,
v.
Raymond J. DONOVAN, Secretary of Labor, et al.
 Nos. 83-1118, 83-1157.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 6, 1983.
Decided July 5, 1983.
 
 Appeals from the United States District Court for the District of Columbia (D.C.Civil No. 82-01631).
 J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Carolyn B. Kuhl, Deputy Asst. Atty. Gen., Robert E. Kopp, Anthony J. Steinmeyer, Frank A. Rosenfeld, Attys., Dept. of Justice, and Karen I. Ward, Associate Sol., Dept. of Labor, Washington, D.C., were on the brief, for appellants/cross-appellees.
 Laurence Gold and Terry R. Yellig, Washington, D.C., with whom Laurence J. Cohen and Robert J. Connerton, Washington, D.C., were on the brief, for appellees/cross-appellants. Linda Lipsett, Washington, D.C., also entered an appearance for appellee in 83-1118.
 Thomas S. Martin, Washington, D.C., was on the brief for Associated Builders and Contractors, Inc., amicus curiae urging reversal in 83-1118 and affirmance in 83-1157.
 G. Brockwel Heylin and Michael E. Kennedy, Washington, D.C., were on the brief for Associated Gen. Contractors of America, Inc., amicus curiae urging reversal in 83-1118 and affirmance in 83-1157.
 Before EDWARDS, Circuit Judge, and McGOWAN and MacKINNON, Senior Circuit Judges.
 Opinion for the Court filed by Senior Circuit Judge McGOWAN.
 McGOWAN, Senior Circuit Judge:
 
 
 1
 This appeal brings before us on an expedited basis five provisions of certain final rules issued by the Secretary of Labor ("the Secretary") under the Davis-Bacon Act, 40 U.S.C. § 276a et seq. (1976), and the Copeland Anti-Kickback Act, 40 U.S.C. § 276c (1976). These statutes, essentially unchanged since their enactment or amendment in the 1930's, guarantee to workers on federal construction projects a minimum wage based on locally prevailing wage rates. Three of the new regulatory provisions of concern here would alter the method for finding the prevailing wage. Another set of regulations would allow federal contractors far greater freedom to use semiskilled helpers on projects than has previously been permitted. The Secretary asserts that this expanded use of helpers would better reflect the practice on private projects. The fifth provision is intended to ease the regulatory burden on federal construction contractors by reducing the detail required in their weekly submissions to the government regarding wages. All of the regulations under challenge are expected to reduce federal construction costs; the Secretary has estimated that the last two provisions alone would save the government or its contractors about $463 million per year. See 47 Fed.Reg. 23,657, 23,662, 23,664 (1982) (regulatory impact statement).
 
 
 2
 This action was brought by the AFL-CIO, sixteen AFL-CIO unions or departments, and the Teamsters union ("the unions"), seeking an injunction against implementation of the new regulations and a declaration that the rules are contrary to law. No claims of procedural irregularity were pressed. The District Court granted the requested relief in part. We affirm in part and reverse in part. We uphold all of the new regulations as within the broad administrative discretion contemplated by Congress, except for (1) the provision simplifying submissions of wage data to the government, which we find to be inconsistent with the language and purpose of the statutory command that the submissions contain wage data as to "each employee," and (2) part of the expanded permission to use helpers, which part we find similarly contrary to statutory language and purpose.
 
 
 3
 * As noted, the Davis-Bacon Act was enacted during the Great Depression to ensure that workers on federal construction projects would be paid the wages prevailing in the area of construction. The evil sought to be remedied was that, with the precise specifications set out in federal contracts and the increasing standardization of building-material prices, the low-bidding contractor on a federal job was generally the one who paid the lowest wages. See generally S.REP. NO. 332, 74th Cong., 1st Sess. pt. 2, at 4 (1935) ("variations between bids submitted by competing contractors are due most frequently to different estimates of labor costs"). The contractor would accomplish this by taking advantage of widespread unemployment in the construction industry and hiring workers at substandard wages, often bringing a low-paid crew in from distant areas. Id. at 7-8.
 
 
 4
 This practice was deemed to be a problem for two reasons. First, and apparently most important, it tended to undercut one of the purposes of the massive federal building program of the times, which was to distribute employment and federal money equally throughout the country. S.REP. NO. 1445, 71st Cong., 3d Sess. 1-2 (1931). Local contractors and workers, used to a certain wage and living standard, could not compete with the migratory labor of the winning bidder. Id. at 2; see also 74 CONG.REC. 6510 (1931) (remarks of Senator Bacon) ("I think it is a fair proposition where the Government is building these post offices and public buildings throughout the country that the local contractor and local labor may have a 'fair break' in getting the contract."); 10 Comp.Gen. 294, 295 (1931) (" 'The Government should be the last employing agency to expect or countenance the performance of its construction contracts at the sacrifice of its citizens.' ") (quoting letter from Treasury Secretary proposing administrative predecessor of Davis-Bacon Act).
 
 
 5
 Second, the lower wages led to labor strife and to broken contracts by contractors who speculated on the labor market unwisely, thus preventing "the most economical and orderly granting of Government contracts." S.REP. NO. 332, supra, pt. 2, at 8; see also 74 CONG.REC. 6510 (1931) (remarks of Rep. LaGuardia) ("the workmanship of the cheap imported labor was of course very inferior"). Nevertheless, under a ruling by the Comptroller General, federal contracting agencies could not insist on contractors paying the prevailing wage because of the statutory requirement that federal contracts go to the lowest bidder. 10 Comp.Gen. 294, 301 (1931) (prevailing wage requirement would "remove[ ] from competitive bidding on the project an important element of cost and tend[ ] to defeat the purpose of the [low-bid] statute"). Thus, legislation was called for.
 
 
 6
 The original Davis-Bacon Act was enacted in 1931 and required that federal contractors on certain projects pay the prevailing wage in the area, as determined by the contractors. Any disputes over the contractors' determinations were to be referred to the Secretary for conclusive determination. Davis-Bacon Act, ch. 411, 41 Stat. 1494 (1931). Dissatisfaction with this arrangement surfaced quickly, however, as widespread violations and abuses were discovered. An attempt to provide for predetermination of the prevailing wage by the Secretary and penalties for failure to pay that rate was vetoed by President Hoover in 1932 as "obscure and complex and ... impracticable of administration," 75 CONG.REC. 14,589 (1932) (veto message); see id. at 14,590 ("The whole design of the new ... proposal requires an expansion of bureaucratic control over activities which now function effectively with the minimum of interference by the Government and that only when dispute arises.").
 
 
 7
 Congress had greater success in 1935. It passed wage predetermination and enforcement provisions that have remained essentially unchanged to this day. The Act now provides that the advertised specifications for every federal construction project in excess of $2,000 that requires the employment of mechanics and/or laborers
 
 
 8
 shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics which shall be based upon the wages that will be determined by the Secretary of Labor to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the city, town, village, or other civil subdivision of the State, in which the work is to be performed.
 
 
 9
 40 U.S.C. § 276a(a) (1976). The construction contract must contain a stipulation requiring that the advertised wages be paid, and the applicable wages must be posted at the site. Id. The contracting agency is empowered to withhold payment to ensure compliance with the minimum wage requirements. Id.
 
 
 10
 In response to some of the abuses prevalent under the 1931 act, Congress in 1934 also passed the Copeland Anti-Kickback Act, which generally makes it a crime for a federal contractor to require or coerce workers to return a portion of their contractual pay to their employer. Copeland Anti-Kickback Act, ch. 482, § 1, 48 Stat. 948 (1934) (codified as amended at 18 U.S.C. § 874 (1976)). The section of the Copeland Act that is relevant here directs the Secretary to make reasonable regulations for federal contractors, "including a provision that each contractor and subcontractor shall furnish weekly a statement with respect to the wages paid each employee during the preceding week." 40 U.S.C. § 276c (1976).
 
 
 11
 The regulations at issue seek to implement these two statutes. They would alter the present regulatory scheme by (1) eliminating the so-called "thirty-percent rule" by which a locally prevailing rate could be set at the rate paid to a thirty-percent plurality of local workers; (2) combining data from adjacent rural counties but excluding any nearby urban counties when wage data in a given rural county is insufficient to determine a locally prevailing wage; (3) excluding from the prevailing-wage calculation for most building projects wages paid on similar local projects that were subject to the Davis-Bacon Act; (4) expanding the permitted use of semiskilled helpers in a number of ways, including permitting such a classification in areas where it is only an "identifiable" practice rather than a "prevailing" one and eliminating the requirement that helpers may do only tasks distinct from those undertaken by other classes of workers; and (5) allowing contractors to submit a weekly statement certifying compliance with Davis-Bacon wage requirements, instead of requiring the submission of the actual weekly payrolls. See 47 Fed.Reg. 23,643, 23,657, 23,677 (1982) (to be codified at 29 C.F.R. § 3.3 and in scattered sections of 29 C.F.R. pts. 1 & 5).
 
 
 12
 Shortly after the rules were promulgated on May 28, 1982, the unions brought suit seeking declaratory injunctive relief. After a hearing on a motion for interim relief and cross-motions for summary judgment, the District Court on July 22, 1982, five days before the new regulations' scheduled effective date, granted a preliminary injunction barring implementation of all five provisions. Building & Construction Trades Department v. Donovan, 543 F.Supp. 1282 (D.D.C.1982). On December 23, 1982, the District Court granted summary judgment for plaintiffs on four of the five provisions at issue. Building & Construction Trades Department v. Donovan, 553 F.Supp. 352 (D.D.C.1982). The court declined to enjoin the elimination of the thirty-percent rule in the formula for calculating the locally prevailing wages. As to this provision, the court found that the statute left the task of defining the term "prevailing wage" to the Secretary, and that "Congress was fully aware that the definition might or would be adjusted depending on existing conditions." Id. at 354 (citing, inter alia, 74 CONG.REC. 6516 (1931); 75 CONG.REC. 12,365 (1932)).
 
 
 13
 The District Court found the statutory language and legislative history as to the remaining four provisions somewhat ambiguous, and relied heavily on contemporaneous and consistent administrative practice as a clue to Congress's intent. The court relied most heavily--almost exclusively--on this contrary administrative practice in striking down the proposed exclusion of urban counties from the prevailing wage calculation in rural areas and the exclusion of local Davis-Bacon projects from that calculation. See id. at 353-54.
 
 
 14
 With regard to the remaining two provisions, the court found, in addition to administrative practice, more direct indications of congressional intent. The court struck down the rule that a contractor need only submit a generalized affidavit certifying compliance with wage laws, rather than detailed payrolls, because the statute by its terms required weekly statements as to the wages paid "each employee," 543 F.Supp. at 1288, and because the new regulation "would render the Act largely unenforceable," 553 F.Supp. at 354. The court overturned the proposals for allowing increased use of semiskilled helpers because the distinction that the Act intended to draw between skilled and unskilled labor in practice could be maintained "only if the tasks of the helper class are defined as discrete and distinguishable from those of laborers and mechanics," id. at 355, and because allowing contractors to use helpers when it was merely an "identifiable" classification in the area would be contrary to the statutory command that wages set by the Secretary be "prevailing for ... classes" in the area, 543 F.Supp. at 1285.
 
 
 15
 Both parties appealed. We discuss each provision of the new regulations in turn.
 
 II
 A. The Thirty-Percent Rule
 
 16
 Under a regulatory procedure in effect since 1935, the Secretary follows a three-step process to determine the prevailing wage for a given class of workers in a given area. First, if any single wage is paid to a majority of the workers in that class, that is deemed the prevailing wage. Second, if there is no single wage paid to a majority of workers, any wage paid to at least thirty percent of the workers is the prevailing wage. Third, if no single wage is paid to a thirty-percent plurality, then a weighted average becomes the prevailing wage. 29 C.F.R. § 1.2(a) (1982); accord Labor Department Regulation No. 503 § 2 (1935), reprinted in Joint Appendix (J.A.) at 180-81. The new regulation proposed by the Secretary for defining the term "prevailing wage" would eliminate the second step: if a majority of the workers in a given class did not earn a single wage, then a weighted average would be used. 47 Fed.Reg. at 23,652 (to be codified at 29 C.F.R. § 1.2(a)(1)).
 
 
 17
 The rationale offered by the Secretary for the change was that the thirty-percent rule does not comport with the definition of "prevailing," that it "gives undue weight to collectively bargained rates," and that it is inflationary. Id. at 23,644, 23,645. The unions argue that the new definition does not fit within the common meaning of "prevailing" and that Congress's refusal to change the statute in 1932 and 1935 when informed of the Secretary's policy of setting the prevailing wage at the rate paid the greatest number of workers indicates that Congress intended the prevailing rate to be the "modal" rate. The unions also assert that under the new rule a third or more of the wage rates issued by the Secretary would be based on "artificial" averages rather than any actual rate, which they say is contrary to the policy of the Act.
 
 
 18
 We affirm the District Court's upholding of the new rule, generally for the reasons stated in its opinion. See 553 F.Supp. at 354. In brief, the statute delegates to the Secretary, in the broadest terms imaginable, the authority to determine which wages are prevailing. See 40 U.S.C. § 267a(a) (1976) ("the wages that will be determined by the Secretary of Labor to be prevailing"). The legislative history confirms that it was envisioned that the Secretary could establish the method to be used. See, e.g., 74 CONG.REC. 6516 (1931) (remarks of Rep. Kopp) ("A method for determining the prevailing wage rate might have been incorporated in the bill, but the Secretary of Labor can establish the method and make it known to the bidders."). There is no indication that Congress's failure to change the method used by the Secretary since 1932 was intended to bind him to that method forever, and we will not infer such an intent when the statutory language is so plainly to the contrary.
 
 
 19
 Having determined that the statute empowers the Secretary to adopt "regulations with legislative effect," Batterton v. Francis, 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977) (interpreting statute providing that term "unemployment" is to be "determined in accordance with standards prescribed by the Secretary"), our task is limited to ensuring that the new definition is not one "that bears no relationship to any recognized concept of [the statutory term] or that would defeat the purpose of the [statutory] program." Id. at 428, 97 S.Ct. at 2407. The Secretary's new definition of "prevailing" as, first, the majority rate, and, second, a weighted average, is within a common and reasonable reading of the term. Cf. 75 CONG.REC. 12,365 (1932) (remarks of Rep. Connery, floor manager of 1932 amendments) (endorsing an averaging method of determining the prevailing wage). The definition also would not defeat the essential purpose of the statute, which was to ensure that federal wages reflected those generally paid in the area.
 
 
 20
 B. Exclusion of Urban Counties from Rural Wage Determinations
 
 
 21
 The Secretary's proposed regulations provide that, where there has not been sufficient similar construction in the county in which a project is located to determine a prevailing wage, he is to look to wages paid on similar construction in surrounding counties, except that projects in metropolitan counties may not be used as a source of data for projects in rural counties and vice versa. 47 Fed.Reg. at 23,655 (to be codified at 29 C.F.R. § 1.7(b)). The target of the unions' attack in this case is the final proviso regarding exclusion of urban counties from rural wage determinations,[1] which the unions assert is a departure from longstanding administrative practice and inconsistent with congressional intent. Neither party questions the Secretary's basic claim of authority to look beyond the county line if necessary to determine the prevailing wage in the county in which the project is located. Because the basis for this general recognition of administrative authority is not entirely obvious, and because it is important to our upholding the new regulation, some discussion of it is warranted.
 
 
 22
 The language of the statute instructs the Secretary to determine the wages that are prevailing for classes of laborers and mechanics "employed on projects of a character similar to the contract work in the city, town, village, or other civil subdivision of the State, in which the work is to be performed." 40 U.S.C. § 276a(a) (1976). Although on its face this language would appear to refer the Secretary only to projects in the same civil subdivision as the contract work, no one has interpreted it that way. Since at least 1935, the Secretary has routinely looked to nearby locales if there was insufficient prior construction in the project county to determine a prevailing wage. See, e.g., Labor Department Regulation No. 503 § 7(2) (1935), reprinted in J.A. at 182 (if there has been no similar construction in county in recent years, "the report shall cover wage conditions in the nearest large city"); 29 C.F.R. § 1.8(b) (1982) (if no similar construction in area, "wage rate paid on the nearest similar construction may be considered"); 21 Fed.Reg. 5801, 5802 (1956) (same). Further, as noted, neither the parties nor the amici here seriously dispute that construction.
 
 
 23
 Most important, the legislative history of the statute suggests that Congress contemplated that the Secretary's authority to determine prevailing wages extended to finding the best way to do so. The Davis-Bacon Act itself and the 1935 amendments passed through both houses of Congress with no discussion of the problem of how the prevailing wage would be determined in villages too small to have a settled wage for the various crafts needed. However, during the House debate on the vetoed 1932 amendments, which were substantially identical to the 1935 amendments on this point, the floor manager, Representative Connery of Massachusetts, addressed the question:
 
 
 24
 Mr. O'CONNOR. But there may be many villages that have no plumbers in them, men actually working as plumbers. Bricklayers and metal workers and other highly skilled trades may not be found in a village in sufficient numbers to enable the Secretary of Labor to establish a prevailing rate of wage.
 
 
 25
 Mr. CONNERY. I think the Secretary of Labor, when he figures out these predetermined rates of wages, will be able to determine that. Generally there is a town near enough to ascertain the prevailing rate of wage for that town. If there is a job in a little town in New York, there will be a city near enough in order to determine the prevailing rate of wage for that little town.
 
 
 26
 Mr. O'CONNOR. But the bill reads "in the city, town, or village where the public work is carried on."[2]
 
 
 27
 Mr. CONNERY. As a practical matter, they have had no trouble in that regard in connection with the Davis-Bacon bill.
 
 
 28
 Mr. O'CONNOR. If they limit it to the language in this bill, there may be trouble about it.
 
 
 29
 Mr. CONNERY. In the Davis-Bacon bill there is the same proposition, and they have been getting along.
 
 
 30
 75 CONG.REC. 12,366 (1932). See also id. at 12,377 (remarks of Rep. Connery) ("The only practical way the committee found [to determine the prevailing wage in towns without wage scales] was that if you had a small town between two large cities they would take the prevailing wage scale of those two cities.").
 
 
 31
 This passage, while not crystal clear, suggests that Congress did not view the language in the statute as foreclosing the Secretary from implementing the Act in the way necessary to achieve its purposes. Clearly, if a prevailing wage could not be set in a given county by looking only to projects in that county, it was essential to the attainment of the general purpose of Congress--the predetermination of locally prevailing wages--that another mechanism be found. In essence, Congress anticipated that the general authorization to the Secretary to set the prevailing wage would encompass the power to find a way to do so in the interstitial areas not specifically provided for in the statute. Cf. generally Permian Basin Rate Cases, 390 U.S. 747, 780, 88 S.Ct. 1344, 1366, 20 L.Ed.2d 312 (1968) ("we are, in the absence of compelling evidence that such was Congress' intention, unwilling to prohibit administrative action imperative for the achievement of an agency's ultimate purposes.").
 
 
 32
 In cases where there is insufficient data from a given civil subdivision to determine a prevailing wage, therefore, the Secretary is acting pursuant to the same kind of delegation of authority that we discussed above with regard to the formula for deriving a prevailing wage from the data collected, see supra p. 616. We thus do not think, as the unions appear to argue, that Congress intended to bind the Secretary to the method suggested by Representative Connery--adopting for rural areas the prevailing wages of the nearest city. The thrust of the passage is that the entire question was left to the Secretary. Representative Connery's suggestion was apparently intended merely to show that some method of determining a wage would be found. Moreover, no language was inserted into the statute that would implement the suggestion, as one might expect for so specific an instruction.
 
 
 33
 We review the Secretary's choice of methods only to ensure that he is acting consistently with the purposes of the statute and that his choice is not arbitrary. We think it clear that the new regulation is rational and furthers the purposes of the statute. The Secretary's justification for the provision was that, because of the disparity between urban and rural wages, using demographically dissimilar counties for such determinations is unreliable. 46 Fed.Reg. 41,443, 42,445 (1981) (proposed rulemaking). Furthermore, the Secretary claimed, importation of high urban wages to rural areas has disrupted labor relations in rural areas because employees have been unwilling to return to their usual pay scales after a Davis-Bacon project has been completed. See 47 Fed.Reg. at 23,647. His answer to the unions' argument that higher urban wages are justified in nearby rural areas because it is the urban workers who often do the work was that if that is generally true the wage scales for the surrounding rural counties would reflect that. Id. All of this makes sense, and the new regulation has not been shown to undermine the central purpose of the statute, which is to ensure that federal contractors pay the wages prevailing in the locality of the project. While it might be true that in some cases the reference rural counties might be more distant from the urban center than the project county, and that looking to them thus would not reveal the higher wages that should be paid in the project county, the bare allegation of that fact cannot overturn the Secretary's informed exercise of authority in an area in which he has considerable expertise and discretion.
 
 
 34
 The District Court relied exclusively or almost exclusively on what it saw as a longstanding and consistent administrative practice contrary to the proposed regulations in striking down the rural-urban wage determination provision and the exclusion of federal projects from wage determinations, see infra pp. 619-622. See 553 F.Supp. at 353-54; 543 F.Supp. at 1286-87. It should be noted first that with regard to the exclusion of urban data from rural determinations the administrative practice has not been quite as consistent as the District Court, in the rush of its expedited proceedings, appears to have been told. At least since 1977, the Secretary's Manual of Operations for Issuance of Wage Determinations Under the Davis-Bacon and Related Acts has provided that "[g]enerally, a metropolitan county should not be used to obtain data for a rural county (or visa [sic] versa)." J.A. at 104. Moreover, it is not only the present administration, but also that of President Carter, that has sought to formalize this practice in new regulations. See 46 Fed.Reg. 4305, 4314 (1981) (final rule) (providing for exclusion of metropolitan counties except in "extraordinary circumstances"), stayed, 46 Fed.Reg. 11,25 3 (1981), and replaced, 47 Fed.Reg. 23,643 (1982).
 
 
 35
 More fundamentally, our disagreement with the District Court's heavy reliance on administrative practice stems from our view that in promulgating these two rules--excluding urban data from rural wage determinations and excluding federal projects from all wage determinations--the Secretary was acting in an area as to which he had some discretion to reach a number of different results rather than an area of pure statutory interpretation as to which there is in theory only a single answer. As the District Court recognized, see 543 F.Supp. at 1290, prior administrative practice carries much less weight when reviewing an action taken in the area of discretion, when little more than clear statement is required, than when reviewing an action in the field of interpretation, where it is thought that the agency's contemporaneous and consistent interpretation of one of its enabling statutes is reliable evidence of what Congress intended. Compare CBS v. FCC, 454 F.2d 1018, 1026 (D.C.Cir.1971) (decision under discretionary "public interest" standard), and Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.1970) (same), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971), with United States v. Leslie Salt Co., 350 U.S. 383, 395-97, 76 S.Ct. 416, 423-24, 100 L.Ed. 441 (1956) (interpreting statutory terms "debenture" and "certificate of indebtedness").
 
 
 36
 C. Exclusion of Federal Projects from Wage Determinations
 
 
 37
 The new regulations make a more dramatic break with the past in excluding from the prevailing-wage calculation prior federal or federally assisted projects subject to the Davis-Bacon Act's prevailing wage requirements. The new rules provide that such projects are not to be considered in wage determinations for building and residential construction projects "unless it is determined that there is insufficient wage data to determine the prevailing wages in the absence of such data." 47 Fed.Reg. at 23,652 (to be codified at 29 C.F.R. § 1.3(d)). The provision will not apply to highway and heavy construction projects, id., where there is little nonfederal construction.[3]
 
 
 38
 The Secretary's rationale for the provision is that including federal projects in the wage determination skews the survey results upward, contrary to the purpose of Congress. See id. at 23,645. Neither the District Court opinion nor the unions dispute the factual basis for this conclusion. Rather, the unions argue that the act and its legislative history, including congressional acquiescence to administrative practice, forbid exclusion of federal projects.
 
 
 39
 The language of the statute on this point refers to the wages determined to be prevailing for laborers and mechanics employed "on projects of a character similar to the contract work." 40 U.S.C. § 276a(a) (1976). The unions point out, quoting the District Court's opinion, that this language mandates the Secretary to consider "projects of a character similar," not "private projects of a character similar." See 543 F.Supp. at 1286. Leaving to one side the question of whether this point would require the Secretary to consider wages paid on federal projects if it no longer served the purposes of the statute to do so, there is substantial evidence in the legislative history and, more importantly, in the premises of the Act, that suggests that Congress did not intend wages on federal projects to be considered at all.
 
 
 40
 First, both the Senate and House reports to the original 1931 bill open, after a summary recommendation that the bill pass, with the following description of its purpose: "The purpose of this measure is to require contractors and subcontractors engaged in constructing, altering, or repairing any public building of the United States ... to pay their employees the prevailing wage rates when such wage rates have been established by private industry." S.REP. NO. 1445, supra p. 4, at 1 (emphasis added); H.R.REP. NO. 2453, 71st Cong., 3d Sess. 1 (1931) (emphasis added). When the act was introduced onto the floor of the House, and several times during the debate, the purpose to have federal wages mirror those in private industry was reiterated. 74 CONG.REC. 6505 (1931) (remarks of Rep. Welch); id. at 6515 (Rep. Kopp) ("This bill simply requires the contractors not to pay less than is paid in private industry."); id. at 6520 (Rep. Zihlman). (There was practically no debate on the bill in the Senate. See id. at 3918-19.)
 
 
 41
 We might be reluctant to rely on these somewhat offhand and isolated remarks in the legislative history were it not that they so plainly reflect the true purpose of the Act. The premise underlying the statute was that there was something wrong with the federal bidding process that prevented the government from achieving subsidiary goals of its construction program that a private contractor might be able to attain. Because federal projects were required by statute to be awarded to the lowest bidder, the government could not, as a private builder might, require that fair wages be paid on the project in order to be sure of quality workmanship, to ensure against labor strife, to maintain its name in the community, or, in the case of the federal government, to pursue equitable distribution of public construction monies. Such substandard wages might also have been more prevalent on federal projects because of their national sponsorship, which might have made them more likely to attract unscrupulous pricecutters than a private, local builder, advertising locally, would have been. Whatever the reason, the result was that workers on government building projects were being paid less than their counterparts in neighboring private projects. Thus, the 1931 committee reports state:
 
 
 42
 The Federal Government must, under the law, award its contracts to the lowest responsible bidder. This has prevented representatives of the departments involved from requiring successful bidders to pay wages to their employees comparable to the wages paid for similar labor by private industry in the vicinity of the building projects under construction.
 
 
 43
 S.REP. NO. 1445, supra p. 4, at 2; H.R.REP. NO. 2453, supra p. 17, at 1-2; see also S.REP. NO. 332, supra p. 4, at 8 (reviewing legislative history of the Act) (the problem of contractors paying below prior prevailing wage and transporting cheap labor to jobs "was particularly true of Government contracts where competitive bidding was in effect"); Regulation of Wages Paid to Employees by Contractors Awarded Government Building Contracts: Hearings on H.R. 12, 122, 7005, 7254, and H.J.Res. 38 Before the House Comm. on Labor, 72d Cong., 1st Sess. 15 (1932) (testimony of AFL President William Green) ("Because contractors seeking and securing Government contracts attempted to exploit workers and pay them a rate of wages that was far below the prevailing rate in private industries in the respective localities where buildings were erected, we strongly appealed to the Congress to enact this prevailing rate of wage law."); cf. id. at 63 (testimony of a general contractor) ("[I]n river and harbor work ... I will guarantee [that] our company and all the private companies are paying higher wages to the dredge men than the Government is" when it acts as its own contractor.). See generally supra pp. 613-614 (discussion of purposes of Act).
 
 
 44
 With this as the Act's premise, it would make no sense to require the Secretary, when setting prevailing wages, to include federal projects in his survey. Since the problem to be remedied was the low wages paid on federal projects, to include them would only impede attainment of the ultimate goal of counterbalancing the flaws in the federal bidding system and equalizing federal and private wages.
 
 
 45
 The fact that the Secretary almost immediately began including federal projects in his wage surveys does not cast doubt upon this reading of congressional intent. The unions acknowledge that the Secretary did so, as the District Court put it, "notwithstanding the congressional mandate," only because as the Depression deepened there was very little private construction from which to derive a private prevailing wage. 543 F.Supp. at 1286. Therefore, what the unions must argue is that Congress, in its refusal in the 1935 amendments to bar the Secretary from using federal data, not only acquiesced in such use but affirmatively required it.
 
 
 46
 What the unions and the District Court point to as evidence that Congress intended to mandate the practice is the change in the statutory language from wages "for work of a similar nature" in the 1931 Act to wages "for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work" in the 1935 amendments. Compare Davis-Bacon Act, ch. 411, § 1, 46 Stat. 1494 (1931) with 40 U.S.C. § 276a(a) (1976). What types of projects, the argument goes, could be more "of a character similar to the contract work" than federal ones?
 
 
 47
 The legislative history is very specific as to the intent of this change. After the passage of the 1931 Act, it developed that craftsmen in some industries were paid more than employees performing the same craft in other industries. In the 1932 House hearings, one witness gave the examples of riveters and electricians in the general building industry who would receive a higher wage, but would be employed far less steadily, than their brethren in the shipbuilding field. Regulation of Wages Paid to Employees by Contractors Awarded Government Building Contracts: Hearings on S. 3847 and H.R. 11,865 Before the House Comm. on Labor, 72d Cong., 1st Sess. 67 (1932) [hereinafter cited as Hearings on S. 3847 ] (testimony of shipbuilding trade representative, proposing addition of "in the same industry" to statute). To clarify that federal construction work wages should parallel the construction work wages prevailing in the area, and not the shipbuilding wages, Congress added the language that the unions cite. The committee reports explain:A provision in the bill makes clear the meaning of the standard "prevailing ... on work of a similar nature." The present language leaves some doubt as to whether the statute refers to wages in the same craft or wages paid on similar construction. The provision would make the wage rates contained in the specifications conform to those "prevailing" for "the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work."
 
 
 48
 H.R.REP. NO. 1756, 74th Cong., 1st Sess. 3 (1935); accord S.REP. NO. 1155, 74th Cong., 1st Sess. 3 (1935).
 
 
 49
 It was thus no part of Congress's intent to require the Secretary to include federal projects in his wage surveys. Excluding such data was the path most consistent with the purposes of the statute. The Secretary nevertheless exercised his discretion to include these projects as a necessary expedient during the Depression in order to achieve the ends of Congress. See generally supra p. 618 (implied power to take action imperative for the achievement of the statute's purpose). To continue to include them now that federal wages are far above those paid in the private sector, however, would only exacerbate in the opposite direction the kind of problem--an inequality between federal and private wages--Congress was seeking to avoid. The fact that no Secretary has previously abandoned the practice does not take away from the current Secretary's power to fine tune his exercise of discretion.
 
 D. Expanded Use of Helpers
 
 50
 Under current practice, the Secretary recognizes five classes of employees covered by the Act: skilled journeymen; unskilled laborers; and semiskilled apprentices, trainees, and helpers. The journeyman and laborer classes are well-defined and universally recognized; the former is generally identified with the traditional crafts, such as electrician or roofer, and often defined by whether the employee uses the tools of the trade. Apprentices and trainees, as the terms imply, are employees learning the journeyman's craft and therefore are permitted to do some traditional journeyman's work, but they must be enrolled in a formal apprenticeship or trainee program approved by the Secretary. See 29 C.F.R. §§ 5.2(c), 5.5(a)(4), 5.15 (1982). The Secretary currently recognized a helper classification only if (1) the scope of the helpers' duties--meaning the physical tasks performed--is defined and can be differentiated from that of journeyman duties, and (2) the particular helper classification prevails in the area. See 47 Fed.Reg. at 23,647, 23,649, 23,659; DeNarde Construction Co., Case No. 78-3, at 2 (Wage Appeals Bd. May 14, 1979), reprinted in Plaintiffs' Reply Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment, exhibit 2, Record at 14.[4]
 
 
 51
 The new regulations would alter both of these limitations on the use of helpers on federal construction jobs. First, they would allow some overlap between the duties of helpers and those of journeymen. While some distinction between skilled and semiskilled tasks would be retained, the essential functional distinction would be not the nature of the task done but rather the subordinate position of the helper vis-a-vis a journeyman. The new classification would be defined as follows:
 
 
 52
 A "helper" is a semi-skilled worker (rather than a skilled journeyman mechanic) who works under the direction of and assists a journeyman. Under the journeyman's direction and supervision, the helper performs a variety of duties to assist the journeyman such as preparing, carrying and furnishing materials, tools, equipment, and supplies and maintaining them in order; cleaning and preparing work areas; lifting, positioning, and holding materials or tools; and other related, semi-skilled tasks as directed by the journeyman. A helper may use tools of the trade at and under the direction and supervision of the journeyman. The particular duties performed by a helper vary according to area practice.
 
 
 53
 47 Fed.Reg. at 23,667 (to be codified at 29 C.F.R. § 5.2(n)(4)); see also id. at 23,668 (to be codified at 29 C.F.R. § 5.5(a)(1)(ii)(A)(1)) (when new categories not listed in wage determination are added to contracts, work to be performed by new classifications must not be performed by any existing classification, except as to helpers.). The second major change in the permitted use of helpers is that any given helper classification would need to be only "identifiable," rather than "prevailing," in the area in order to be included in the wage determination for a project. Id. at 23,655 (to be codified at 29 C.F.R. § 1.7(d)).
 
 
 54
 In addition, the new regulations would provide a new numerical limitation on the use of helpers under which there could be no more than two helpers for every three journeymen, i.e., a maximum of forty percent of the total number of helpers and journeymen could be helpers. Id. at 23,670 (to be codified at 29 C.F.R. § 5.5(a)(4)(iv)). Also, if a worker listed on the payroll as a helper performed duties outside the definition provided in the regulations, or exceeded the forty-percent limitation, the worker would have to be paid the applicable wage for the work he or she actually did. Id.[5]
 
 
 55
 The Secretary's rationale for allowing expanded use of helpers was that the present limitations do not reflect "the widespread industry practice" of employing both particular craft and general utility helpers on construction projects. Id. at 23,647. The Secretary estimated that the expanded use of helpers would save the government $363.16 million in construction costs. Id. at 23,651. In addition, he stated, the new rules would increase job opportunities for less skilled workers, including young people, women, and minorities; encourage training; increase productivity; and enable more contractors to compete for government work. Id.
 
 
 56
 This last reason is presumably based on the fact that unions have historically permitted very limited use of helpers, seeking instead to ensure demand for skilled journeymen and the integrity of the apprenticeship route to that position. See, e.g., id. at 23,651 ("there are few helpers in union firms"); A. THIEBLOT, THE DAVIS-BACON ACT 154 (1975), reprinted in Record at 3893, 3978 (71.1% of nonunion contractors and 16.1% of union contractors surveyed use helpers for various crafts); S. SLICHTER, UNION POLICIES AND INDUSTRIAL MANAGEMENT 46 (1941) ("The building trades ... undertake to prevent helpers from becoming competitors of journeymen by regulating the work of the helper in such a way that he does not have an opportunity to learn the trade," such as by prohibiting him from using the tools of the trade.); Affidavit of Herbert R. Northrop (Wharton School Professor of Industry), J.A. at 108 ("More efficient deployment of labor [such as by allowing extensive use of helpers] is one reason why open shop construction today controls 65 percent of all construction ...."); Affidavit of Robert A. Georgine (President, AFL-CIO Bldg. & Constr. Trades Dept.), J.A. at 122-23 (collective bargaining agreements preclude many contractors from taking advantage of the changes in the new regulations). Apparently, the Secretary believes that more nonunion contractors would be able to compete for government jobs under the new regulations because they would be able to use the employee classification system that they are accustomed to using. See Affidavit of John L. Fiedler (construction firm president), J.A. at 114 ("[A] contractor who regularly uses helpers on privately funded construction work must reclassify helpers when he does work subject to the Davis-Bacon Act.... [T]his is economically unwise, since the productivity of the worker is not commensurate with his wage. Therefore, many merit shop contractors are deterred from performing federal or federally assisted construction contracts.").[6]
 
 
 57
 We consider first the provision that a helper classification need only be "identifiable" in an area to be used, and second the enlarged definition of a helper's duties.[7]
 
 1. "Identifiable" Classifications
 
 58
 The provision requiring that a helper classification need only be "identifiable" in an area must be struck down because it operates to undermine the fundamental purpose of the Act: that wages on federal construction projects mirror those locally prevailing. We think it plain that, in the scheme of the Act, either of two methods will serve to lower the wages paid for certain work below those paid for the same work in the surrounding community. First, the work may be classified as it is in the community--as, say "carpenter work"--but a lower wage may be paid for that classification than is paid in the community. Second, the same wage rate may be set for each job classification, but the work may be classified in a lower paying category--such as "carpenter's helper work"--than it is in the community. Thus, if a given lower paid job classification need only be "identifiable" in the community to be used on a government construction site, the wages paid for some work may well be less than those "prevailing" for that work in the community. To take a simplified example, suppose that unions dominate the construction industry in a certain city and require that any worker using carpenters' tools be a journeyman carpenter or apprentice. Nevertheless, suppose that one or two nonunion firms in the city use lower paid carpenter's helpers to rough-cut beams. In that case, a federal project that permitted workers who rough-cut beams to be termed "carpenter's helpers," because such a classification could be "identified" in the city, would not be paying the wage prevailing for the corresponding class of workers in that city. The prevailing wage for that kind of work would actually be the union wage for journeyman carpenters or apprentices.
 
 
 59
 We need not rely merely on logic to know that use of a less-than-prevailing classification may result in payment of lower wages than those prevailing in the community for the same work, and that that is prohibited by the Act. Congress in 1935 was quite clear that it understood that "prevailing wage scales [could be] broken down by intermediate classification," S.REP. NO. 332, supra p. 4, pt. 3, at 12, and that such "underclassifi[cation]," id., was an evasion of the Act. The Senate committee reviewing the operation of the law in 1935 described the problem as follows: "The act also fails to be explicit on the matter of classification, with the result that many contractors were able to circumvent the law by hiring mechanics as common laborers, and then assigning them to tasks which fell within the purview of one of the skilled crafts." Id. pt. 2, at 5; see also id. at 2 (listing creation of "arbitrary classifications known as semiskilled labor" as a method or device "to underpay labor" engaged on public works programs). The report gave the example of "rough 'saw and hammer' men" working on Public Works Administration projects who
 
 
 60
 were paid at a rate considerably less than [the wages] prevailing for carpenters, although the work being performed was regarded by labor-union regulations as carpentry work. In a similar way, new grades and classifications sprang up all over the country, permitting high-grade skilled laborers to be placed in lower categories so that their rates of pay were less than those prevailing for skilled labor.
 
 
 61
 Id. pt. 3, at 12.
 
 
 62
 Although the 1935 committee recommended that the "classification" question "should be clarified by new legislation," id. pt. 2, at 5, it is not clear whether the statutory language regarding "classes of laborers and mechanics" was added with this in mind. See infra pp. 627-629. The House and Senate reports on the bill itself mention this language only with regard to the somewhat different problem of differing wages being paid for the same craft in different industries. H.R.REP. NO. 1756, supra p. 622, at 3; S.REP. NO. 1155, supra p. 622, at 3; see supra pp. 621-622. Nevertheless, various references in the legislative history strongly suggest that Congress thought either that such underclassification was already barred--for example, the earlier 1935 committee's references to contractors that "circumvent the law" and its conclusion that the law should be "clarified"--or that it certainly would be under the law as amended, see Hearings on S. 3847, supra p. 621, at 110 (remarks of Rep. Welch) ("If that were brought to the attention of the Secretary of Labor, if this bill were in full force and effect .... [he] would not permit it ....").
 
 
 63
 What is clear is that Congress regarded underclassification as contrary to the purposes, and most probably to the terms, of the Act. We have concluded that the Secretary's identifiable-classification regulation would virtually ensure underclassification in union-dominated areas. At least where the Secretary has not found the use of helpers as provided for in the new rules to be a nearly universal practice, see 47 Fed.Reg. at 23,647 (practice is merely "widespread"); Affidavit of John T. Dunlop (former Labor Secretary), J.A. at 188 ("The fact is that helpers exist in some areas and in some trades, and not in others."),[8] he is barred from allowing work that is "prevailing" categorized in one job classification to be placed in a lower paid classification merely because such a practice can be "identified" in the area.
 
 2. Definition of Helper Duties
 
 64
 While we thus think it clear that the provision allowing use of helpers wherever the classification is "identifiable" must be struck down, whether the broadened definition of a helper's duties may stand is a far closer question. The issue is essentially this: if it is the prevailing practice in a community to allow lower paid but supervised helpers to undertake tasks that overlap with those of higher paid journeymen or laborers, may the Secretary allow that practice to be followed on federal projects in that town? The central objection to the Secretary's new regulation is that it would no longer define the "classes" of laborers and mechanics by the tasks a particular employee does, but rather in large part by whether he or she is acting under the supervision of a journeyman. See 553 F.Supp. at 355 ("the new regulations would allow helpers ... to perform tasks of all sorts"); 543 F.Supp. at 1285 ("Under the new regulations, helpers not only are not defined in traditional terms, but they may perform any task throughout the entire construction field ....").[9]
 
 
 65
 There is some legislative history that suggests that Congress in 1935 was thinking of a task-based definition of "classes" when it spoke of the problem of "underclassification." For example, the 1935 Senate committee considering the operation of the Act described the problem of contractors assigning to common laborers "tasks which fell within the purview of the skilled crafts,"see supra p. 28 (emphasis added), and referred to the "rough saw and hammer men" category as a violation of the rule that "any man using carpenter's tools shall be paid carpenter's wages," S.REP. NO. 332, supra p. 4, pt. 3, at 17.
 
 
 66
 Nevertheless, we do not think Congress intended to bind the Secretary to the job classification existing at that time, but rather merely spoke against a background of the task-based union practice being the prevailing one. The Senate report seems to take some pains to point out that the reason the "rough saw and hammer men" classification resulted in underpayment of labor was that it was "a direct violation of the union rule in general effect throughout the country," id. (emphasis added); see id. at 12 (the work being performed "was regarded by labor-union regulations as carpentry work").
 
 
 67
 Moreover, there is no language in the statute that might be said to implement the supposed intent to mandate the union classification scheme. The only otherwise unexplained change worked by the 1935 amendments was the addition of the phrases "various classes of laborers and mechanics" and "corresponding classes of laborers and mechanics" in place of the 1931 reference to the rate of wage for "all laborers and mechanics." We see nothing inherently task-oriented about the term "classes." It seems likely that the addition of the word "classes" was intended merely to describe in a general way the nature of the wage predetermination the Secretary was to make under the new statute. Had the amendments required only that advertisements for bids contain "a provision stating the minimum wages to be paid all laborers and mechanics which shall be based upon the wages ... prevailing for work of a similar nature," it might conceivably have been thought that a single minimum wage was to be set for construction work rather than a set of wages for the various classes or grades of workers involved.[10]
 
 
 68
 Further evidence that Congress did not intend to mandate the then-existing union practice is that, as the unions here admit, Congress specifically rejected a scheme whereby wages would be set at the union wage in all areas. See Wages of Laborers and Mechanics on Public Buildings: Hearing on S. 5904 Before the Senate Comm. on Manufacturers, 71st Cong., 3d Sess. 9 (1931); Brief for Appellees-Cross-Appellants at 60; Reply Brief for Appellees-Cross-Appellants at 6. The following exchange during the House debate on the 1932 bill clearly indicates the congressional intent on the matter:
 
 
 69
 Mr. JOHNSON of South Dakota.... I want to know if the union scale is to govern in all matters in this bill, particularly in those cities where I am convinced the racketeering end of union labor has taken control.
 
 
 70
 Mr. CONNERY. The Secretary of Labor is the final arbiter, and I do not believe that he has taken the union scale absolutely. He has taken the prevailing rate of wage in those cities.
 
 
 71
 Mr. JOHNSON of South Dakota. Then it would not be the intention of the chairman of the committee [Mr. Connery] that the union scale in all cases would be the prevailing rate?
 
 
 72
 Mr. CONNERY. Personally, that is what I would like to see.
 
 
 73
 Mr. JOHNSON of South Dakota. It would not be so construed in the bill if it is passed?
 
 
 74
 Mr. CONNERY. No.
 
 
 75
 75 CONG.REC. 12,377 (1932); accord id. 12,379 (remarks of Rep. Ramspeck) (in some cases, the Secretary has not required the union scale). Since, as we have discussed, wage rates and classifications are essentially two sides of the same coin--they must be fixed in tandem to ensure that a given wage will be paid for given work--Congress's rejection of the then widespread union pay scales as the conclusive basis for the Secretary's predetermination of wages suggests that it similarly favored locally prevailing practices over the union classification scheme.
 
 
 76
 At bottom, we are unwilling to read the fairly ambiguous legislative references to a task-based classification system in such a way as to vitiate the clearly expressed congressional purpose to have federal wages mirror those prevailing in the area. See, e.g., S.REP. NO. 509, 72d Cong., 1st Sess. 2 (1932) ("This bill will in no way interfere with the natural increase or decrease of prevailing wage scales ...."); H.R.REP. NO. 1756, supra p. 21, at 1 (The bill's "object is to reinforce and extend the principle of ... the 'Bacon-Davis Act' ... which requires the payment of the prevailing rate of wages to laborers and mechanics employed" on federal projects.); see also H.R.REP. NO. 308, 88th Cong., 1st Sess. 2 (1963) (the Act "was designed ... to prevent the disturbance of the local economy"). Yet were the Secretary barred in all cases from allowing helpers to do work that overlaps with the tasks done by journeymen, the wages paid on federal projects for certain work would sometimes not be the same as those prevailing in the area for the same work.
 
 
 77
 We do not say that there is no content to the statutory term "classes." See generally Donahue, The Davis-Bacon Act and the Walsh-Healey Public Contracts Act: A Comparison of Coverage and Minimum Wage Provisions, 29 LAW & CONTEMP. PROBS. 488, 508 (1964) (written by Labor Dep't Solicitor) ("[T]he Secretary generally takes the local corresponding classes of laborers and mechanics as he finds them, although he may not use criteria which detract from the term 'classes,' as used in the act."). We simply say that the core concept of that term--that those things within the class be differentiable from those things outside of it--is not weakened by a definition that makes the common element supervision by journeymen rather than use of tools.
 
 
 78
 The unions and the District Court present a subtler argument than one based on a direct congressional intent to define "classes" in a certain way. They appear to agree that the legislative history discussed above suggests only that Congress was aware of the need to prevent workers doing skilled work from being underpaid by being classified as semiskilled employees. The "crux" of the argument, as the District Court put it, is that "in practice" the distinction between skilled and unskilled or semiskilled labor "can be maintained only if the tasks of the helper class are defined as discrete and distinguishable from those of laborers and mechanics." 553 F.Supp. at 355. The argument is, in other words, that as a practical matter the Secretary is wrong to think that his definition is capable of enforcement, because it is simply too difficult to tell a helper from a journeyman on a job site.
 
 
 79
 We agree that discerning whether a person using certain tools is being directed and supervised by a journeyman is far harder than merely telling whether that person is using the tools of the trade. Nevertheless, there is a substantial policy that argues against simply choosing a rough and simple distinction, and that is that such a distinction might mean the wage scales on federal work would no longer reflect the prevailing practice in the area, which would be counter to the central purpose of the Act. We think the Secretary is entitled to try to come closer to achieving that purpose than his predecessors have. Cf. American Trucking Associations v. Atchison, T. & S.F. Ry., 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967) ("[W]e agree that the Commission, faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice.").
 
 
 80
 The change may mean that some unscrupulous contractors will find it easier to shift what the prevailing practice denominates journeyman work onto helpers, but we find it difficult to second-guess the Secretary's view that he can catch them. We do not mean that we cannot review the Secretary's decision against a charge that he has effectively abandoned the field. But our deference to his choice is properly near its greatest when his decision turns on the enforceability of various regulatory schemes. He and not the courts can best balance such shifting dynamics as the incentive to violate the rules, the willingness of construction workers and competitors to complain, the ability of his inspection staff to respond and to discover violations, and the effectiveness of sanctions. See, e.g., FCC v. WNCN Listeners Guild, 450 U.S. 582, 596-97, 101 S.Ct. 1266, 1275-76, 67 L.Ed.2d 521 (1981) ("predictions as to the probable conduct of licensees and the functioning of the broadcasting market and ... the Commission's assessment of its capacity to make the determinations required by [the alternative approach] ... are within the institutional competence of the Commission").
 
 
 81
 Moreover, it is important to note that in this case the Secretary is not overturning a policy that has worked to perfection. He has concluded that "the current policies regarding semi-skilled crafts do not adequately reflect construction industry practices, in particular, the widespread use of helpers to perform certain craft tasks." 47 Fed.Reg. at 23,662. Perhaps as a result, federal wages today, rather than being below those in the private sector, are in some cases far above. See GENERAL ACCOUNTING OFFICE, THE DAVIS-BACON ACT SHOULD BE REPEALED 71 (1979) (on twelve projects where wage determinations were higher than GAO-determined prevailing rate, average difference was 36.8%). No one has attacked this basic finding. The fact that the past practice has not been entirely successful tends to predispose a reviewing court to allow the Secretary to try a different scheme that, while more difficult to enforce, might on balance result in a closer approximation of the prevailing wage. See American Trucking Associations, 387 U.S. at 416, 87 S.Ct. at 1618 (regulatory agencies are supposed "to adapt their rules and practices to the Nation's needs in a volatile, changing economy").
 
 
 82
 The Secretary's definition here is not clearly unreasonable or on its face impossible to enforce. First, the distinction between supervised and supervising personnel is a common one in the labor field. It is thus not a completely untested distinction nor one that has proven impossible to draw.
 
 
 83
 Second, the new regulation, as modified by the requirement that the classification prevail in an area before it may be used, is an entirely logical response to the problem of federal construction practice not reflecting the widespread, but not universal, practice of using helpers. The new regulation would lower the current federal wages for the most part in those nonunion areas where they are significantly above the wages paid in the area. See, e.g., A. THIEBLOT, supra p. 24, at 94, reprinted in Record at 3948 (effect of 35-day suspension of Act in 1971 was "negligible" in highly unionized areas, but "often substantial" in nonunion areas). In the union areas of the country where helpers are little used, they would not be allowed on federal projects. Thus, the new regulation would be narrowly aimed at correcting the federal practice in areas where it has not worked well, and would not result in a wholesale reduction in journeyman wages.
 
 
 84
 Third, but by no means least important, the Secretary has increased the likelihood that gross violations will be caught, or at least that evasion will not get too far out of line, by putting the forty-percent cap on the use of helpers. While it might be desirable for the cap to reflect the extent of use in the area, rather than provide a single nationwide cutoff, the existence of some cap at least increases our confidence that the Secretary has considered the enforcement problems of the new definition and responded to them. See 46 Fed.Reg. at 41,456 (proposed 1:5 helpers-to-journeyman ratio was intended "to protect against possible abuse").[11] All things considered, the unions have not shown the Secretary's choice of regulatory schemes to be arbitrary or capricious.
 
 
 85
 E. Allowing Submission of Summary Statement of Compliance with Wage Laws
 
 
 86
 The Secretary's present regulations require covered federal contractors and subcontractors to submit weekly a copy of their payrolls, listing the name and address of each laborer or mechanic, and his or her classification, rate of pay, daily and weekly hours worked, deductions made, and actual wages paid. 29 C.F.R. § 5.5(a)(3) (1982). With the exception of a three-year hiatus from 1948 to 1951, the regulations have continuously required the submission of such payrolls since 1935, immediately after the Copeland Anti-Kickback Act was passed. See Construction Regulations and Regulations Issued Pursuant to So-Called "Kick-Back Statute" pt. II (1935), reprinted in J.A. at 172, 178-79 [hereinafter cited as 1935 Kick-Back Regulations]; 13 Fed.Reg. 524 (1948) (eliminating the provision); 16 Fed.Reg. 4430, 4431 (1951) (reinstating the provision).
 
 
 87
 Initially the Copeland Act required a "sworn affidavit" with respect to the wages paid, so the regulations required that the payrolls be accompanied by an affidavit from the employer swearing that "the attached pay roll [was] ... true and accurate" and that no unreported deductions or rebates had been made. 1935 Kick-Back Regulations, supra p. 39, pt. II, § 2, reprinted in J.A. at 178. In 1958, in a law to improve government procurement opportunities for small business concerns, the Copeland Act was amended to require a "statement" rather than a "sworn affidavit" and to make false statements a criminal offense. Act of Aug. 28, 1958, Pub.L. No. 85-800, § 12, 72 Stat. 967. The regulations thus now require that the payroll be accompanied by a statement indicating that the payroll is correct and complete, that the wage rates are not less than those determined by the Secretary, and that the classifications for each laborer or mechanic conform to the work done. 29 C.F.R. § 5.5(a)(3)(ii) (1982) (contract provision); see id. § 3.3 (regulatory requirement).
 
 
 88
 The new regulation would eliminate the requirement that payrolls be submitted, while maintaining the required weekly submission of a statement of compliance. The statement would certify that the payrolls the employer is required by the regulations to maintain are correct and complete, that each laborer or mechanic has been paid the full wages earned without impermissible deduction or rebate, and that the wage rates paid are the applicable ones for the classification of work performed. 47 Fed.Reg. at 23,669 (to be codified at 29 C.F.R. § 5.5(a)(3)(ii)); id. at 23,679 (to be codified at 29 C.F.R. § 3.3(b)).
 
 
 89
 The Secretary justified the change as a reduction in unnecessary paperwork, since the submitted payrolls are "infrequently used by many Federal agencies." Id. at 23,662. He estimated that the elimination of the requirement would save $100 million in compliance costs. Id. The unions disputed the cost savings involved, arguing that the estimates ignored the enforcement benefits of the payroll reporting requirement. Id. In this court, the unions also cite Labor Department testimony that the payrolls are typically reviewed at the beginning of each project and spot-checked thereafter, with contractors that have a history of violations receiving more thorough checks. See Federal Contractors' Reporting Requirements: Hearing on S. 1681 Before the Subcomm. on Federal Spending Practices and Open Government of the Senate Comm. on Governmental Affairs, 96th Cong., 1st Sess. 18 (1979); see also id. at 147 (memorandum of HUD Inspector General) (contractor is less likely to underpay if he is required to submit weekly payroll reports). Since we find the Secretary's relaxation of the reporting requirement to be contrary to a direct statutory command, we need not reach the question of whether the payroll reporting requirement is, as the District Court found, "essential to the achievement of the Act's purposes" because of the transient nature of much construction business, 543 F.Supp. at 1288-89; accord 553 F.Supp. at 354 (new regulation "would render the act largely unenforceable").
 
 
 90
 We think that when Congress directed the Secretary to require contractors to "furnish weekly a sworn affidavit with respect to the wages paid each employee during the preceding week," Copeland Anti-Kickback Act, ch. 482, § 2, 48 Stat. 948 (1934), it meant that the wages paid each employee should be separately reported and sworn to. Under the Secretary's reading of the statute, the intent of the reporting provision would be little more than to add a further criminal penalty--that of perjury--to the crime of underpaying one's employees. We think the reporting provision was intended to play, in addition, a role in uncovering violations of the law. The most persuasive evidence of this is, of course, the word "each" and the requirement that the submission be "weekly." If the provision were meant only to add perjury to the criminal penalties provided by section 1 of the act, then it would seem unnecessary to have the affidavit refer to "each" employee since a statement as to all of them would presumably be untrue if any one was underpaid. Under the Secretary's reading, it would also seem to be unnecessary to require a "weekly" submission, since a blanket statement at the end of the contract term would serve to criminalize any single breach during construction. Both of these provisions are most naturally read if one attaches an investigatory purpose to the act, that is, if the requirement was intended to aid in uncovering, not merely punishing, violations. Only a requirement that payrolls be submitted would help uncover violations, either by exposing contractors who accurately reported underpayments or by simplifying the task of investigators in spot-checking for violations or turning up unusual patterns.
 
 
 91
 Further support for this reading is provided by the initial phrase of the section in the original act, which read, "To aid in the enforcement of the above section." The "above section," section 1 of the act, made it a criminal offense to induce an employee to give up any part of the compensation to which he or she is entitled. Section 2 would only really "aid in the enforcement" of section 1's criminal provision if it helped catch violators rather than if it merely added to the underlying conduct a further penalty with apparently the same or greater elements of proof.
 
 
 92
 The legislative history of the act does not contradict, and to a large extent supports, this reading of the statutory language. The affidavit provision was not mentioned in the committee reports or on the floor of the House, where there was no debate on the act at all. There was also no debate in the Senate, except that Senator Copeland briefly introduced the bill, stating in part,
 
 
 93
 It is the purpose of the bill to have the Secretary ... require that an affidavit be made as to the pay roll each week so that we may have some way of reaching those who may be guilty of this practice [of requiring kickbacks from employees].
 
 
 94
 78 CONG.REC. 7401 (1934). While the words "as to" slightly support the Secretary's view that only a generalized affidavit about the wages paid was required, the mention of the weekly "pay roll" tends to support the unions' view that a sworn copy of the payroll was required. Further support for the latter position is provided by the stated purpose of providing "some way of reaching those who may be guilty of this practice." The word "reaching" must have meant "uncovering," supporting an inference that the provision had an investigatory purpose, because if the aim was merely further to criminalize a failure to pay, the penalties of section 1 would already provide "some way of reaching" violators.
 
 
 95
 Moreover, when the idea of requiring weekly reporting was advanced in the hearings that led to the enactment of the provision, the witnesses making the suggestion were crystal clear that the payrolls themselves should be submitted in order to allow them to be "watch[ed] ... constantly." 1 Investigation of So-called "Rackets": Hearings Before a Subcomm. of the Senate Comm. on Commerce Pursuant to S. Res. 74, 73d Cong., 2d Sess. 791 (1933); accord id. at 816 (to "follow up" on predetermination of wages). Furthermore, in response to one witness's mention of a case in which a contractor made his subcontractor "present his pay roll," Senator Copeland indicated that he thought it a "very practical suggestion that every pay roll should be certified and sworn to," clearly implying that the Senator expected that the payrolls themselves would be filed. Id. at 793 (emphasis added). Similarly, the 1935 report of the committee investigating the operation of the Davis-Bacon Act, on which Senator Copeland served, mentioned the then new regulations requiring submission of payrolls, which the report said were issued "[p]ursuant to the provisions of the Copeland Act" and which it said would "enable[ ] a thorough check of the pay rolls." S.REP. NO. 332, supra p. 4, pt. 2, at 5.
 
 
 96
 There is no indication that the subsequent amendments of the Copeland Act were intended to alter this original intent. See Act of Aug. 28, 1958, Pub.L. No. 85-800, § 12, 72 Stat. 967 (replacing "sworn affidavit" with "statement"); Act of May 24, 1949, ch. 139, § 134, 63 Stat. 108 (deleting reference to section 1 of the act). In fact, when the law was amended in 1958 to require only a "statement" instead of a "sworn affidavit," the Senate committee report stated that the act required the filing of "payroll information." S.REP. NO. 2201, 85th Cong., 2d Sess. 2, 9 (1958); see also id. at 16, U.S.Code Cong. & Admin.News 1958 p. 4021 (reprinting National Advisory Committee for Aeronautics letter approving the change in "the filing of payroll information" so that only "a weekly statement of wages paid" would be required).
 
 
 97
 We think the Copeland Act clearly contemplated that the statement required to be submitted would provide some amount of wages paid to each employee each week. We do not say that the actual payrolls themselves, complete with their records of deductions and taxes withheld, must be required to be submitted. But we do think that the statement required by the act must contain at least individualized wage information for each covered employee.
 
 III
 
 98
 We affirm the District Court as to the Secretary's elimination of the thirty-percent rule, the provision allowing use of helpers if that classification is "identifiable" in the area, and the provision allowing submission of a statement certifying compliance with wage laws. We reverse as to the provision excluding urban counties from certain rural wage determinations (and vice versa), the provision excluding prior Davis-Bacon Act projects from the wage calculations under the Act, and the expanded definition of a helper's duties.
 
 
 99
 It is so ordered.
 
 
 
 [1]
 Since there is usually enough similar construction in metropolitan areas to provide data necessary to make a wage determination, the proviso would generally affect wage determinations only in rural areas, where there tends to be less construction
 
 
 [2]
 The bill actually read "in the city, town, village, or other civil subdivision of any State or Territories in which all or the principal part of the particular contract work is located." 75 CONG.REC. 12,363 (1932) (first reading of S. 3847)
 
 
 [3]
 The Manual of Operations for Issuance of Wage Determinations Under the Davis-Bacon and Related Acts defines "residential construction" as "the construction, alteration, or repair of single family houses or apartment buildings of no more than four (4) stories in height"; "building construction" is other construction of "sheltered enclosures with walk-in access"; "highway construction" means more or less what it says; and "heavy construction" is a catch-all category that includes such major projects as dams, railroads, ski tows, subways, and canals. J.A. at 100-02
 
 
 [4]
 Occasionally, but not always, a third criterion for recognition of a helper classification is mentioned: "the helper is not used as an informal apprentice or trainee." 47 Fed.Reg. at 23,649. But see id. at 23,647, 23,659 (not mentioned); DeNarde (same). This criterion appears to have been eliminated in the new regulations. The parties have not focused on it, however, and therefore neither do we
 The requirement that a classification be prevailing in an area also applies to journeymen and laborers, but appears not to apply to apprentices and trainees. See 29 C.F.R. § 1.2(a) (1982) (Secretary sets prevailing wage rate "for each classification of laborers and mechanics which [he] shall regard as prevailing in an area"); id. § 5.5(a)(4)(i) (apprentices permitted to earn less than predetermined wage for the work they perform, if they are registered); id. § 5.5(a)(4)(ii) (same for trainees). The new regulations would eliminate the prevailing-in-the-area requirement for journeymen and laborers, see 47 Fed.Reg. at 23,655 (to be codified at 29 C.F.R. § 1.7(d)) ("Classifications and wage rates will be issued for identifiable 'classes of laborers and mechanics.' "), but the unions do not complain about this provision.
 
 
 [5]
 There are two other provisions that would apply to the use of helpers. First, an existing contract that does not contain a helper classification could be altered to allow the expanded use permitted by the new regulations. Id. at 23,668 (to be codified at 29 C.F.R. § 5.5(a)(1)(ii)(A)). Second, variances from the 40% rule could be obtained in areas where the current practice allows use of helpers in excess of forty percent of the total number of helpers and journeymen. See id. at 23,659
 
 
 [6]
 It is unclear whether the Secretary, in finding that more contractors would be able to compete for government work under the new rules, simply ignored the likely decrease in the number of unionized contractors who would be able to compete for such work, see Affidavit of Robert A. Georgine, supra, J.A. at 122-23, or instead believed that that decrease would be more than offset by the increase in nonunion bidders
 The unions disputed many of the claimed benefits of the expanded use of helpers, arguing inter alia that the new rules would discourage apprenticeship and training programs because contractors would find it easier simply to hire helpers to fulfill their need for semiskilled labor rather than set up a formal program. Because helpers receive far less training than do apprentices, the unions argued, the new rules would tend to deny advancement to minorities, young people, and women, and would lead to a shortage of skilled craftsmen. See, e.g., 47 Fed.Reg. at 23,647; Affidavit of Ray Marshall (former Labor Secretary), J.A. at 133, 138-40. In this court, the unions rely largely on the argument that the new regulations are directly contrary to the language and intent of the statute rather than on the ill effects of the changes.
 
 
 [7]
 The District Court enjoined the operation of all the new regulations governing the use of helpers, including the 40% rule, the procedure for conforming existing contracts to the new regulations, and the procedure for a variance from the 40% rule for certain existing projects. See 543 F.Supp. at 1292 (preliminary injunction); 553 F.Supp. at 356 (permanent injunction). Nevertheless, like the unions in this court, the District Court only discussed the expanded definition of "helper" and the provision that a helper classification need only be "identifiable" in an area to be used. Evidently, the court regarded the helper provisions as a package, the essential elements of which were the two that it discussed; once those were struck down, there was no need to deal with the others since the Secretary would surely redraft the package, perhaps changing the minor aspects of it in the process. Not having the benefit of any significant discussion of the issues, we decline to rule on these aspects of the helper provision. Should the Secretary include them in any reissued rules, we will not be barred from considering them then
 
 
 [8]
 We do not here attempt to define all the circumstances under which a new class of employees must be prevailing in an area before the Secretary may allow its use. We merely suggest that there may be some circumstances in which, perhaps for reasons of administrative convenience or because of a need to further some other congressionally expressed policy, e.g., National Apprenticeship Act, 29 U.S.C. § 50 (1976) (Secretary is directed "to bring together employers and labor for the formulation of programs of apprenticeship"), or for other reasons, the Secretary could provide for classifications that do not prevail in a certain area. No such reason appears here. The propriety of eliminating the requirement that classifications of journeymen and laborers be prevailing in an area is not before us. See supra note 4
 
 
 [9]
 A more fundamental objection to the Secretary's new regulations might be that the Davis-Bacon Act does not contemplate any semiskilled labor classifications whatsoever. This objection, not clearly pressed on us, see infra, would be based primarily on the fact that the statute speaks only of "laborers and mechanics," and not of "helpers." There is some legislative history supporting such an interpretation of the statute. For example, the report of the Senate committee investigating the operation of the Act in 1935 cited the following practice as a "device[ ] ... to underpay labor":
 Instances of failure by Federal Emergency Relief Administration officials to pay the prevailing wage on Public Works projects, and the creation by such officials of arbitrary classifications known as semiskilled labor specifically prohibited by the Federal Emergency Relief Administration regulations.
 S.REP. NO. 332, supra p. 4, pt. 2, at 2 (emphasis added).
 There are, however, indications elsewhere in the legislative history that Congress used the term "laborers and mechanics" to mean all manual workers on construction sites, and not to exclude semiskilled employees. For example, at the end of the part of the Senate report just quoted, the committee recommended amendment of the Act so that it would require that the specifications for any project which "involve[d] the employment of mechanics and/or laborers ... contain a provision stating the minimum wages to be paid various classes of skilled, unskilled, and intermediate labor," and that the contracts for such projects obligate the contractor to pay "all mechanics and laborers employed" the wages in the specifications. Id. at 9 (emphasis added). Since it would make no sense to set wages for intermediate or semiskilled workers if they were not to be covered by the Act, it appears that the committee thought the term "mechanics and laborers" included some intermediate classifications other than skilled and unskilled labor. (The language "skilled, unskilled, and intermediate labor" was replaced by the phrase "laborers and mechanics" before the amendments were enacted, but no explanation of the change appears. The change may have been intended merely to make the language of the statute, which refers to "laborers and mechanics" thirteen other times, consistent throughout. In any case, the fact that the two phrases could appear so close together in a considered committee recommendation in which they must be read to refer to the same categories of workers suggests that it was not assumed by all that the two were contradictory.) Moreover, elsewhere in its report the committee plainly used the term "laborers and mechanics" to mean manual workers generally, with no thought of excluding semiskilled workers. See, e.g., id. at 1 ("public hearings were conducted and testimony of 100 witnesses (laborers and mechanics, representatives of labor, contractors, and representatives of various Government departments) was received") (emphasis added).
 In addition, it appears that the Federal Emergency Relief Administration (FERA) regulations referred to in the Senate report themselves recognized semiskilled labor classifications, the wage rates for which were to "depend upon local custom." Federal Civil Workers Administration Rules and Regulations No. 10 at 2 (1933), reprinted in J.A. at 198 (the Civil Works Administration was an arm of the FERA). Thus, what the committee referred to as a device to underpay labor in violation of the FERA regulations must not have been the use of intermediate classifications per se, but the "creation" of "arbitrary" semiskilled classifications not reflected in local practice, in order to underpay skilled labor.
 Further support for a reading of the statute that does not bar the use of semiskilled classifications entirely is provided by the Secretary's longstanding interpretation of the Act to allow at least a limited use of helpers. See supra p. 622. Also, the District Court in this case clearly thought the current use of helpers was permitted by the Act. See 543 F.Supp. at 1285. Moreover, the unions in this court appear not to quarrel with this view, for they quote the District Court's opinion at length and endorse its conclusions, see Brief for Appellees-Cross-Appellants at 31-33; elsewhere they argue that Congress's intent in this regard "had been consistently recognized and followed by the Secretary of Labor" until the challenged regulations, id. at 43. But see id. at 38-39 (disputing the government's view that the Senate committee accepted the use of legitimate semiskilled classifications). (The unions' position was unequivocally stated in their memoranda filed in the District Court: "[W]e do not take the position that Congress precluded recognition of semiskilled helpers under the Davis-Bacon Act.... Quite clearly, the Davis-Bacon Act does allow recognition of semi-skilled workers when they do, in fact, represent a prevailing practice and form a distinguishable class who perform discrete tasks." Plaintiffs' Reply Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment at 10, 11, Record at 14 (emphasis in original).)
 While we think the argument that any helper classification was barred by the statute is at least colorable, the long-held view of the Secretary and the legislative history of the statute taken as a whole persuade us to agree that the Secretary is empowered to recognize at least some form of semiskilled classification. The remainder of the present section considers whether the specific definition of "helper" proposed by the Secretary is barred by the statute.
 
 
 [10]
 The vetoed 1932 act contained the term "grades" instead of "classes." The legislative history does not reveal the reason for the change, although it may have been to counter an interpretation of the word "grades" that was advanced by President Hoover's Secretary of Labor in a memorandum that accompanied the President's veto message. Secretary Doak wrote that the new law would
 require[ ] the determination of the rate of wages for the "various grades of mechanics and laborers," clearly indicating that the rate is to be determined not only for the different trades, as bricklayers and carpenters, but for the different grades of such workers within each trade, which would require an official determination of the comparative efficiency of individual workers employed on the work by the contractor or subcontractor.
 
 
 [75]
 CONG.REC. 14,589 (1932). The new term "classes" may have been inserted to assure that qualitative evaluations of workers within a certain type need not be made. Prior to the 1932 act, concerns about underclassification were voiced similar to those expressed prior to the 1935 amendments, see Hearings on S. 3847, supra p. 20, at 109 (testimony of shipbuilding trade representative) ("in the shipyards the line between the mechanic and the helper and the semiskilled man has been very largely broken down"), suggesting that the change from "grades" to "classes" was not intended to take into account new information on underclassification
 
 
 [11]
 We repeat that we have not been provided with a significant discussion of the issues regarding the 40% cutoff and therefore do not here pass on the propriety of it. See supra note 7