BUILDING & CONSTRUCTION TRADES DEPARTMENT, AFL–CIO, et al., Appellants,

v.

Lynn MARTIN, Secretary of Labor, et al.

No. 90–5345.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 31, 1991.

Decided April 21, 1992.

Terry R. Yellig for appellant Bldg. and Constr. Trades Dept., Inc.

Robert J. Connerton, with whom Paul Greenberg was on the brief, for appellant Laborers' Intern. Union of North America, AFL–CIO.

Robert M. Loeb, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Anthony J. Steinmeyer, Atty., Dept. of Justice, were on the brief, for appellees.

Jerry L. Hill and Mark Bredemeier were on the brief for amicus curiae Landmark

Center for Civil Rights, urging that this Court uphold the validity of the helper regulations.

Maurice Baskin and Patrick J. Stewart, were on the brief, for amicus curiae Associated Builders and Contractors, Inc., urging that the District Court's decision be affirmed.

Before D.H. GINSBURG, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

The Building and Trades Department, AFL–CIO, and the Laborers' International Union, AFL–CIO, (the "unions") appeal from an order of the District Court vacating its injunction of the implementation of five regulations promulgated by the Secretary of Labor pursuant to the Davis–Bacon Act. The provisions in question regulate the wages and use of the "helper" class of workers on federal construction projects. We uphold four of the challenged provisions, but strike down as arbitrary and capricious a formula for calculating a cap on the ratio of helpers to journeymen on federal construction projects.

## BACKGROUND

In 1931, Congress enacted the Davis–Bacon Act (the "Act"), 40 U.S.C. § 276a *et seq.* (1986), to ensure that workers on federal construction projects were paid no less than prevailing wage rates in the locality of such projects. 74 CONG. REC. 6510 (1931) (statement of Sen. Bacon). As noted by this Court,

> [t]he evil sought to be remedied was that, with the precise specifications set out in federal contracts and the increasing standardization of building-material prices, the low-bidding contractor on a federal job was generally the one who paid the lowest wages.... The contractor would accomplish this by taking advantage of widespread unemployment in the construction industry and hiring workers at substandard wages, often

bringing a low-paid crew in from distant areas.

*Building and Construction Trades' Dept., AFL–CIO v. Donovan,* 712 F.2d 611, 613–14 (D.C.Cir.1983) (citations omitted), *cert. denied,* 464 U.S. 1069, 104 S.Ct. 975, 79 L.Ed.2d 213 (1984). Under the Act, the advertised specifications for each federal construction project in excess of $2,000 must contain minimum wage provisions for each class of laborer and mechanic based upon prevailing wages in the locality of performance as determined by the Secretary of Labor. 40 U.S.C. § 276a(a) (1986).

Pursuant to the broad statutory mandate to set wages and classify workers, the Secretary of Labor has by regulation recognized several categories of workers and set out rules governing their employment on federal construction projects. Prior to 1982, the regulations permitted the use of the helper classification only where the tasks to be performed by helpers were defined and could be differentiated from the duties of journeymen, and where the helper classification prevailed in the area where the contract was to be performed. Regulatory changes proposed in 1982 attempted to redefine helper as a "semiskilled worker (rather than a skilled journeyman mechanic) who works under the direction of and assists a journeyman." 29 C.F.R. § 5.2(n)(4) (1991). The new regulation went on to permit an overlap of duties between those of a helper and those of a journeyman. Where the older regulations had permitted the use of the helper classification in areas where that job title prevailed, the new regulation permitted the use of the classification where the use of helpers was an "identifiable" local practice. 47 Fed.Reg. 23,655 (1982). The regulation further permitted the use of no more than two helpers for every three journeymen. 29 C.F.R. § 5.5(a)(4)(iv) (1991).

The unions immediately sued to enjoin implementation of the 1982 helper regulations and several other of the Secretary's new proposals. Finding for the unions in part, the District Court enjoined implementation of the helper provisions. *Building and Construction Trades Dept., AFL–CIO v. Donovan,* 553 F.Supp. 352 (D.D.C.1982).

On appeal, we affirmed the District Court's judgment in part and reversed in part. *Building and Construction Trades' Dept.,* 712 F.2d at 633. We agreed that the Secretary had improperly permitted the use of helpers in localities where their actual use was merely "identifiable" as opposed to "prevailing." *Id.* at 624–26. However, we found acceptable the Secretary's broad definition of helper. *Id.* at 626–30. The District Court modified its judgment accordingly by rescinding its injunction as to the definition of helper, while leaving in place its injunction as to the test for whether helpers are "prevailing" and as to the other helper provisions. *Building and Construction Trades Department, AFL–CIO v. Donovan,* 102 Lab. Cas. (CCH) ¶ 34,648, 1984 WL 1484 (D.D.C.1984). The District Court expressed its willingness to consider rescinding its remaining injunction if the Department of Labor ("DOL") revised the helper regulations. *Id.*

The Secretary proposed new helper regulations on August 19, 1987, 52 Fed.Reg. 31,366 (1987), and gave notice of their adoption on January 27, 1989, 54 Fed.Reg. 4234–44 (1989). Obedient to our holding in *Building and Construction Trades' Dept.* that a "prevailing" use of helpers is more than merely an "identifiable" use, the new proposal set forth two alternative tests for determining whether the use of helpers "prevails" in a particular locality. The regulation provides:

(1) If the prevailing wage for a particular journeyman classification is a wage that is paid to the majority of the journeymen ..., then the practice followed by those contractors whose rates are adopted as prevailing for the journeyman shall also be deemed the prevailing practice in determining whether to issue a helper classification. Any ambiguity with regard to such practice, will be resolved by following the rule in paragraph (d)(2) of this section with respect to those contractors.

(2) If the prevailing wage for a particular journeyman classification is the average of the wages paid to the journeymen, weighted by the total number of journeymen ..., then the total number of workers in the classification employed by contractors utilizing helpers (journeymen plus apprentices, trainees, and helpers as defined in § 5.2(n)(4) of this chapter) on reported projects will be compared to the total number of workers in the classification employed by contractors not utilizing helpers ..., and the practice which covers the majority of such workers shall be deemed the prevailing practice in determining whether to issue a helper classification.

29 C.F.R. § 1.7(d)(1)–(2) (1991).

In other words, where the Secretary verifies that the prevailing journeyman wage in a locality where a federal construction project is to be situated is the wage paid to the majority of journeymen in that locality, then the helper classification is deemed to prevail if contractors who pay the prevailing wage use helpers. The classification is deemed not to prevail if contractors who pay the prevailing journeyman wage do not use helpers. Second, if the Secretary has used a weighted average method to determine the prevailing wage for journeymen, then the Secretary compares the total number of workers employed by contractors in the area who use helpers to the total number of workers employed by contractors who do not. The practice followed by the employers of the larger number is deemed the prevailing practice. *Id.* In the present appeal the unions attack these new tests.

The 1989 regulations also revised the "conformance" procedure prescribed by the Secretary. The conformance procedure is a long-used device for adding an employee classification to the specifications of an existing government contract. Generally, the conformance procedure provides that whenever an existing contract does not contain a classification otherwise necessary to perform a government contract, the contracting officer may propose the appropriate classification and wage rate to the Administrator of the Wage and Hour Division, who is authorized to approve, modify, or disapprove the contracting officer's action within thirty days. *See* 29 C.F.R. § 5.5(a)(1)(ii) (1991).

The revised conformance procedure provides that the contracting officer may approve an additional classification and wage rate only when the work to be performed is not already performed by a classification in the existing wage determination, the proposed classification "is *utilized* in the area by the construction industry," and the proposed wage rate bears a reasonable relationship to the wage rate contained in the determination. 29 C.F.R. § 5.5(a)(1)(ii)(A) (emphasis supplied). The 1989 revision excepted the helper classification from the prohibition against performance of work already assigned to another classification in the contract. 29 C.F.R. § 5.5(a)(1)(ii)(A)(*1*) (1991). Additionally, the Secretary of Labor, in a new provision, expressly added the requirement that "with respect to helpers ... such a classification *prevails* in the area in which work is to be performed," 29 C.F.R. § 5.5(a)(1)(ii)(A)(*4*) (emphasis supplied), not merely is "utilized."

On September 24, 1990, the District Court vacated the remaining portions of its injunction. It thereby rejected all of the unions' challenges, concluding that our prior opinion compelled it to uphold these regulations. *Building and Construction Trades Department, AFL–CIO v. Dole,* 116 Lab. Cas. (CCH) ¶ 35,395, 1990 WL 192541 (D.D.C.1990). Subsequently, the unions appealed to this Court. The unions contend that the "prevailing" test undermines the purpose and objectives of the Act by, among other things, recognizing "non-prevailing practices." They further argue that the DOL's definition of helper subverts the purpose of the Act by allowing two or more worker classes to perform the same task. The unions also object to both of the 1989 modifications to the conformance procedures and to the cap of two-to-three on the ratio of helpers to journeyman employable on federal construction projects, 29 C.F.R. § 5.5(a)(4)(iv) (1991), which remained unaffected by the 1989 modifications.

## DISCUSSION

### A. *The Appropriations Bill Rider*

Before discussing the substance of the regulations, we first note that the unions object to the authority of the Secretary to implement the helper regulations. On April 10, 1991, Congress attached a rider to an emergency supplemental appropriations bill making funds available for the United States military operation in the Middle East. *Dire Emergency Supplemental Appropriations for Consequences of Operation Desert Shield/Desert Storm, Food Stamps, Unemployment Compensation Administration, Veterans Compensation and Pensions, and Other Urgent Needs Act of 1991,* Pub.L. No. 102–27 § 303, 105 Stat. 130, 151 (1991). The rider prohibited the Secretary from spending any funds to implement the helper regulations, stating:

> Notwithstanding any other provision of law, no funds shall be expended by the Secretary of Labor to implement or administer the [helper definition, the 2:3 ratio, the test for when helpers are prevailing, and the revised conformance provision] ... or to implement or administer any other regulation that would have the same or similar effect.

*Id.* The unions argue that the rider is permanent legislation—a congressional directive barring implementation. They note that the rider has no expiration date apparent on its face and submit that when a rider's language suggests a congressional intent that it be made permanent law, this Court must respect that intent. *See, e.g., Elizabeth Norcross v. United States,* 142 Ct.Cl. 767 (1958). The difficulty with the unions' argument is that we see no evidence of a congressional intent that this rider be made permanent law.

While appropriation acts are "Acts of Congress" which can substantively change existing law, there is a very strong presumption that they do not, *see TVA v. Hill,* 437 U.S. 153, 190, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978), and that when they do, the change is only intended for one fiscal year. *See Minis v. United States,* 40 U.S. (15 Pet.) 443, 10 L.Ed. 791 (1841); *National Treasury Employees Union v. Devine,* 733 F.2d 114, 120 (D.C.Cir.1984); GENERAL ACCOUNTING OFFICE, PRINCIPLES OF

FEDERAL APPROPRIATIONS LAW, 2–34 (1982). In fact, a federal appropriations act applies only for the fiscal year in which it is passed, unless it expressly provides otherwise. *See* 31 U.S.C. § 1301(c)(2) (1991). Accordingly, a provision contained in an appropriations bill operates only in the applicable fiscal year, unless its language clearly indicates that it is intended to be permanent.

■ The unions argue that a clear intent to establish a permanent bar in this case is present in Congress' statement that, "no funds shall be expended by the Secretary of Labor to implement or administer" the disputed regulations. The unions claim that the location of this statement in a rider attached to an act that did not appropriate any funds for that purpose further establishes clarity of intent to bar implementation permanently.

It is true, as the unions note, that the General Accounting Office (the "GAO"), in its publication, GAO, PRINCIPLES OF FEDERAL APPROPRIATIONS LAW, recognizes that the absence of an appropriation for the purpose limited by the rider is some indication of permanence. *Id.* at 2–34—2–37. However, while the absence of such an appropriation may be useful in ascertaining congressional intent, standing alone it is not enough to indicate permanence. As the GAO has also stated, "the presence or absence of words of futurity remains the crucial factor, and the additional factors have been used for the most part to support a conclusion based primarily on this presence or absence." *Id.* at 2–37. Similarly, as GAO has explained, "a proviso or general provision [in an appropriations act] that does not contain words of futurity will generally not be construed as permanent." *See id.* at 2–34—2–35. Principally, courts have recognized that when Congress intends a provision in an appropriations bill to have permanent effect, it uses words of permanency or futurity (such as "to apply in all years hereafter"). *See Minis*, 40 U.S. (15 Pet.) at 445; *Norcross*, 142 Ct.Cl. at 768. In this case Congress used no words of futurity or permanency. Consequently, we do not infer from the absence of an appro-

priation standing alone that Congress intended to impose a permanent ban.

The unions offer snippets of legislative history in support of their argument for futurity, but legislative history can only help to explain a statute; it cannot reconstruct it. The unions also stress the presence of the words "notwithstanding any other provision of law ..." in the rider. Pub.L. No. 102–27, § 303, 105 Stat. 130, 151. This language, however, goes to the breadth of the amendment's effect, not its duration.

In short, nothing in the rider affects the ability of the Secretary to promulgate the present regulations at any time other than during the 1991 fiscal year. The record before us indicates that the Secretary did not expend any funds to implement or administer the new helper regulations during the 1991 fiscal year. Therefore, the presence of the appropriations rider offers us no reason to find error in the District Court's order.

### B. *The Content of the Regulations*

Having determined that the Secretary retains the statutory authority to implement the regulations, our function remains the same as it was for our previous review of these regulations. As we stated then, "our task is limited to ensuring that the new definition [of helper] is not one 'that bears no relationship to any recognized concept of [the statutory term] or that would defeat the purpose of the [statutory] program.'" *Building and Construction Trades' Dept.*, 712 F.2d at 616, quoting *Batterton v. Francis*, 432 U.S. 416, 428, 97 S.Ct. 2399, 2407, 53 L.Ed.2d 448 (1977). In other words, we must ensure that the Secretary "is acting consistently with the purposes of the statute and that his choice is not arbitrary." *Building and Construction Trades' Dept.*, 712 F.2d at 618.

#### 1. The revised tests for "prevailing" use of helpers

■ The unions have in no way demonstrated that the Secretary acted arbitrarily in designing the new tests, or that the tests defeat the purpose of the Act by recogniz-

ing "non-prevailing practices." In striking the old "identifiable" standard, we concluded that it defeated the purpose of the Act. That is, if a federal project could use the helper classification in a locality where it merely could be "identified," but in which, for example, the majority of workers were on union projects not employing the helper category and were receiving higher wages than helpers, then according to any definition of "prevailing," the contractor on the project "would not be paying the wage prevailing for the corresponding class of workers in that city." *Building and Construction Trades' Dept.*, 712 F.2d at 625.

The new tests do not suffer from the same defect, especially as, between them, they cover each possibly applicable concept of "prevailing." Any federal project employing the helper category will reflect either the practice of contractors employing a majority of journeymen in the locality or a majority of workers engaged in relevant employment in a weighted average locality. In neither instance can the Secretary's determination that a practice prevails be said to be arbitrary or contrary to the Act's purpose of aligning wages on federal projects with local rates.

### 2. Definition of "helper"

■ Under the rubric of "underclassification," the unions renew an attack on the definition of helper rejected by this Court in *Building and Construction Trades' Dept.*, 712 F.2d at 626–30. The underclassification theory holds that the Act's attempt to mirror the local wage is subverted when a regulatory definition allows members of a lower paid and lower skilled class to be hired to perform tasks which a higher class normally performs in cases where tasks overlap. The unions contend that the supervision-based helper definition now proposed by the Secretary, rather than one based on task surveys, will bring work performed in the past by unionized laborers into the job description of lower paid helpers.

The short answer to this objection is that we already approved the definition in *Building and Construction Trades' Dept.* and, consequently, it will, as the law of the case, survive the present challenge. *See* 712 F.2d at 629–30. Furthermore, we remain fully satisfied with our treatment of this issue in our previous decision. As we discussed at length in the earlier opinion, the Secretary's statutory authority does not require task-oriented definitions. *Id.* Insofar as the unions' objection is based on the failure of the Secretary to employ task surveys in *implementation* of the regulation, that question is not before us. In this case we review its validity, not its implementation.[1]

The argument that the regulation sweeps "higher paid" laborers into the category of "lower paid" helpers is illusory. There is no reason in reviewing the facial validity of this regulation to believe that the unions' assumptions are accurate. That semi-skilled helpers will be paid less than un-skilled or semi-skilled laborers is far from a foregone conclusion. In any event, the whole argument focuses on the styling of workers rather than either what they do or who supervises them, and, as we have noted, nothing in the statute requires the Secretary to implement "the union[s'] classification scheme." *Building and Construction Trades' Dept.*, 712 F.2d at 627.

The argument also ignores the proposal by the DOL before us here, which would give full weight to the wages normally paid to unionized laborers when calculating the "prevailing wage" to be paid to helpers. First, it would count as helpers all unionized workers who fit the helper definition. Then, if a helper classification is determined to prevail in the area, the wages normally paid to unionized laborers would be given "full weight" in the calculation of the prevailing helper wage. "Full weight," according to the DOL, means that "if these union workers are the majority of the helpers in the area, then, generally, their 'majority wage' will be paid to all helpers.

---

**1.** We do not understand the use of the supervision-based definition to preclude any role for task-based surveys in implementation.

And if they are not the majority, their union wage will still be accounted for in the weighted average used to establish the prevailing wage." Brief of Appellees Secretary of Labor, *et al.*, at 34.

We approve of, and consider this proposal a necessary interpretation of, the "prevailing" test. Thus, laborers will be counted as helpers, and the helper wage will be either that paid to the majority or the average of the wages paid to the total employed in the helper class. This method is not only sensible, it is consistent with relevant provisions of the regulations. 29 C.F.R. § 1.2(a)(1) (1991) in its entirety states:

> The *prevailing wage* shall be the wage paid to the majority (more than 50 percent) of the laborers or mechanics in the classification on similar projects in the area during the period in question. If the same wage is not paid to a majority of those employed in the classification, the *prevailing wage* shall be the average of the wages paid, weighted by the total employed in the classification.

### 3. Conformance provision

■ The unions raise several challenges to the revised conformance regulation. First, they contend that under the regulation a helper classification can be added when it is not "prevailing" in the area. However, the regulation expressly refutes that contention: "The contracting officer shall approve an additional classification ... only when ... [w]ith respect to helpers ... such a classification *prevails* in the area in which the work is performed." 29 C.F.R. § 5.5(a)(1)(ii)(A)(*4*) (1991) (emphasis supplied).

Second, the unions assert that a contracting officer could add a helper class without DOL approval. This assertion also is simply incorrect. The conformance regulation expressly requires DOL approval before a helper class can be added, *see* 29 C.F.R. § 5.5(a)(1)(ii)(B)–(C) (1991)—approval the DOL cannot grant unless the class prevails in the area.

They further object to the regulation's excepting the helper classification from the requirement that the work performed by the requested classification not be performed by a class already in the wage determination. They fear that this provision will allow a lower-paid helper classification to replace a higher-paid class of semi-skilled laborers already in the wage determination and working under the supervision of a journeyman.

As explained by the Secretary upon adoption of the regulation, however, the revision to the conformance regulation accommodates the helper definition by allowing a helper's duties to overlap with a journeyman's duties. 54 Fed.Reg. 4240–41 (1989). At the same time, the regulation specifically prohibits the addition of a lower-paid classification to replace an existing classification of semi-skilled workers, by providing that:

> any class of laborers or mechanics, including helpers, *which is not listed in the wage determination* and which is to be employed under the contract shall be classified in conformance with the wage determination.

29 C.F.R. § 5.5(a)(ii)(A) (1991) (emphasis supplied). By the terms of this section, if a class of workers whose members meet the helper definition is already listed in a wage determination (regardless of the name given to the classification in the wage determination), an additional helper classification would not be issued. Thus, if a laborer sub-classification listed in the wage determination meets the helper definition, an additional helper classification would not be added to the contract. We therefore agree with the District Court that the revised conformance regulations survive the unions' challenge.

### 4. The 2:3 ratio

■ In 1982 the Secretary added to the helper regulations a cap of 2:3 on the ratio of helpers to journeymen. *See* 29 C.F.R. § 5.5(a)(4)(iv) (1991). Neither this Court nor the District Court has ruled on the validity of the 2:3 ratio, but we noted in 1983 that we would not be barred from considering the issue later if it remained a part of any reissued regulations. *Building and Construction Trades' Dept.*, 712 F.2d

at 624 n. 7. Today we conclude that the regulation setting the ratio reflects a purely arbitrary choice without rational decisionmaking.

The basis upon which the forty percent cap was selected by the Secretary as the numerical limit on the use·of helpers on Davis–Bacon projects is unexplained. Neither the 1982 regulations nor the Notice of Proposed Rulemaking which preceded the final rulemaking, *see* 52 Fed.Reg. 31,366 (1987), explains its origin. At oral argument, counsel suggested that the Secretary may have relied on a ratio of nonjourneymen to journeymen found in a particular project agreement negotiated by the Building and Construction Trades Department, AFL–CIO, but the Secretary has provided no justification for making it a national standard. The administrative record shows little consideration of the ratios appearing in the industry and only minimal experimentation with a 1:5 ratio. *See* 46 Fed. Reg. 41,463 (1981).

Such an unsubstantiated imposition of a fixed ratio in a regulatory scheme based on a statute designed to implement prevailing practices represents the very essence of arbitrariness. It is true that a regulation must be sustained as long as the agency has articulated a reasonable basis for its decision. *American Trucking Associations, Inc. v. ICC,* 697 F.2d 1146 (D.C.Cir. 1983). Here, however, all the agency has done is to state that a 2:3 ratio better reflects industry use of helpers than did the 1:5 ratio. 55 Fed.Reg. at 50,148–49 (1990). To state a conclusion is not to reason. We therefore reverse the District Court's vacation of its injunction as to the 2:3 ratio.

### CONCLUSION

We affirm the District Court's vacation of the injunction against enforcement of 29 C.F.R. §§ 1.7(d), 5.5(a)(1)(ii)(A)(*1*), and 5.5(a)(1)(ii)(A)(*4*). In so doing, we uphold the revisions of the "prevailing" test and of the conformance provision. However, we reverse the District Court's vacation of the injunction against the enforcement of 29 C.F.R. § 5.5(a)(4)(iv), the formula of 2:3 for calculating a cap on the ratio of helpers to journeymen on federal construction projects, and invalidate this one provision as arbitrary and capricious.

*Affirmed in part and reversed in part.*