**ATLANTIC FISH SPOTTERS ASSOCIATION, Jonathan A. Mayhew, Robert Sampson, William C. Chaprales, and Ralph E. Pratt, Plaintiffs,**

**v.**

**The Honorable Donald L. EVANS, as he is Secretary of the United States Department of Commerce, Defendant,**

**and**

**General Category Tuna Association and Northshore Community Tuna Association, Defendant–Intervenors.**

**No. CIV. 01–10968–WGY.**

United States District Court,
D. Massachusetts.

May 22, 2002.

H. Reed Witherby, Smith & Duggan, Boston, MA, Andrew D. Herman, Brand, Lowell & Ryan, P.C., David E. Frulla, Brand & Frulla, P.C., Jay Sewell Johnson, Washington, DC, for Plaintiffs.

Anton P. Giedt, U.S. Attorney's Office, Boston, MA, for Defendants.

### MEMORANDUM AND ORDER

YOUNG, Chief Judge.

## I. INTRODUCTION

The plaintiffs, Atlantic Fish Spotters Association and others (collectively referred to hereinafter as the "Association"), bring this civil action against the defendant, Secretary of the United States Department of Commerce Donald L. Evans (the "Secretary"). The Association challenges the inclusion of a condition (the "Permit Condition") to granting General and Harpoon category fishing permits for harvesting Atlantic Bluefin Tuna ("Bluefin"). The Permit Condition requires the permit holder to agree not to use spotter planes when fishing for Bluefin. The Permit Condition is mandated by the 2001 appropriations bill for the Department of Commerce, Justice and State in Section 634 of House Bill 5548 ("Section 634"), passed by Congress on December 21, 2000, for the fiscal year 2001, which ended on September 30, 2001.

The Association argues that the ban on fishing with spotter planes in Section 634 was intended to apply only during fiscal year 2001; it therefore seeks declaratory and injunctive relief preventing the Secretary from enforcing the ban beyond fiscal

year 2001, including during the new Bluefin fishing season that begins June 1, 2002.

In contrast, the Secretary views the ban as permanent and applicable to the Department of Commerce in fiscal years 2001, 2002, and thereafter. Although the Secretary had not issued any permits in the General and Harpoon Categories for 2002 as of April 11, 2002, he intends to include a Permit Condition banning the use of spotter planes in 2002 General and Harpoon category permits unless Congress changes the law in the interim.

Both the Association and the Secretary, as well as defendant-intervenors General Category Tuna Association ("General") and the Northshore Community Tuna Association ("Northshore"), have moved for summary judgment. For the reasons that follow, the Court DENIES the Association's motion for summary judgment and ALLOWS the Defendant's and the Intervenors' motions for summary judgment.

## II. BACKGROUND

Bluefin tuna is among the most valuable fish species harvested in the Western Atlantic Ocean. A single Bluefin may sell for more than $50,000.

Fishing permits, which are required in order legally to fish for Bluefin, come in several categories, two of which are relevant here. The General Category is the largest and covers the methods most fishermen use, including harpoons and rods and reels. The Harpoon Category applies to fishermen using only harpoons.[1] For all of these methods, the use of spotter planes to identify schools of fish from the air and alert fishermen to their precise location is very effective when harvesting Bluefins, and results in a greater catch. In fact,

intervenors General and Northshore oppose spotter planes precisely because they are too effective: they contend that the use of spotter planes shortens the Bluefin fishing season because boats utilizing them quickly catch the lion's share of the permissible amount of Bluefin to be harvested for each fishing season.

Section 634 of House Bill 5548—an appropriations bill for the Departments of Commerce, Justice, and State—places a ban on the use of spotter planes while fishing for Bluefin. Section 634 reads:

*None of the funds provided in this or any previous Act, or hereinafter made available to the Department of Commerce shall be available to issue or renew, for any fishing vessel, any general or harpoon category fishing permit for Atlantic bluefin tuna that would allow the vessel—*

> (1) to use an aircraft to locate, or otherwise assist in fishing for, catching, or possessing Atlantic bluefin tuna; or

> (2) to fish for, catch, or possessing [sic] Atlantic bluefin tuna located by the use of an aircraft.

Act of December 21, 2000, Pub.L. No. 106–553, app. B § 634, 114 Stat. 2762, 2762A–114 (enacting H.R. 5548, 106th Cong. (2000)) (emphasis added). This appropriations "rider" prohibits the Secretary's designees at the National Marine Fisheries Service (the "Service") from using Department of Commerce funds to grant fishing permits in the General and Harpoon Categories to any fisherman who utilizes spotter planes. Given this limitation, the Service subsequently affixed the following uniform general condition to all Federal Fisheries Permits for the Bluefin

---

1. A third category of Bluefin permits—the Purse Seine Category, which allows for the use of large nets to dredge the bottom of the ocean and yields the highest number of fish per catch—is not at issue in this litigation.

General and Harpoon Categories ·for the 2001 fishing year:

> The owner, operator, and/or any person on board the vessel to which this permit is issued agree as a condition to the issuance of this permit that the fishing activities of the vessel will not involve the use of an aircraft in any manner to: (1) locate, or otherwise assist in fishing for, catching, or possessing Atlantic bluefin tuna; or (2) fish for, catch, or possess Atlantic bluefin tuna.

Compl. Ex. 1 (2001 Federal Fisheries Permit for the vessel *EzyDuzit*, owned by one of the plaintiffs, William C. Chaprales). The Secretary has made it clear that the ban on spotter planes in the General and Harpoon Categories will be included in all 2002 permits issued in these categories. Def.'s Mem. at 4 [Docket No. 39].

## III. DISCUSSION

The Association argues the appropriations act at issue here cannot be read to extend the ban on spotter planes for Bluefin fishing beyond fiscal year 2001, which ended on September 30, 2001. According to the Association, conditions contained in appropriations bills presumptively apply only to the fiscal year in which they are passed, absent language indicating futurity or other explicit indicia of Congressional intent that the legislation be permanent. It further contends that no such language or intent can be found in the act at issue here. The word "hereinafter," used in Section 634, commonly limits the terms appearing before it to the same document or writing. Accordingly, so the Association argues, it ought be read, as used in Section 634, to limit this provision to the 2001 fiscal year.

One consequence of this fact, in the Association's view, is that the Secretary's decision to extend the ban beyond the 2001 fiscal year amounts to agency rulemaking that did not satisfy the notice and public comment requirements of the Administrative Procedure Act (the "APA"), 5 U.S.C. § 551 *et seq.* Another consequence is· that the Secretary was required to conduct a regulatory flexibility analysis to analyze the impact of this putative rulemaking on the small businesses affected, and discuss ameliorative measures and alternatives as required under the Regulatory Flexibility Act (the "RFA"), 5 U.S.C. §§ 601–12. Because the Secretary failed to satisfy either of these requirements of agency rulemaking, the Association posits that the extension of the ban on plane spotters beyond fiscal year 2001 is invalid.

According to the Secretary, Section 634 applies beyond fiscal year 2001 because: (1) the term "hereinafter" indicates futurity on its own; and (2) "hereinafter" is used in a sentence that reads "None of the funds provided *in this or any previous Act, or hereinafter* made available to the Department of Commerce ...." (emphasis added). The inclusion of the language "this ... Act" in the clause preceding "hereinafter" shows that "hereinafter" in this sentence applies to the future. To construe the term otherwise, says the Secretary, would render the words "this or any previous Act" superfluous. Therefore, the Secretary's argument goes, accepted rules of statutory interpretation require the term "hereinafter" to be defined to indicate futurity, precisely what is required to denote permanency in a yearly appropriations act.

Accordingly, the Secretary contends that he made the issuance of permits in these categories contingent on an agreement not to use spotter planes in order to comply with the Congressional mandate in Section 634. Simply put, the Secretary claims he did not interpret that law, he implemented it. Thus, there was no obli-

gation to comply with either the APA or the RFA.

As the foregoing discussion makes clear, the principal issue for this Court to decide is whether the ban on the use of spotter planes to fish for Bluefin was meant to be limited to the 2001 fiscal year, or was meant to extend through 2002 and beyond. The resolution of this issue turns on how the Court defines the word "hereinafter." If "hereinafter," as used in Section 634, clearly indicates futurity, then the bill on its face applies beyond fiscal year 2001 and the Secretary cannot be said to have engaged in rulemaking. He simply followed the law. If, however, the permanence of Section 634 is not obvious, then the Secretary effectively engaged in rulemaking by interpreting the provision on his own to apply beyond the end of fiscal year 2001, and in so doing promulgated a rule that did not comply with the notice and comment provisions of the APA and did not examine the effect of the proposed rule on small businesses as is required under the RFA.

Time is of the essence in deciding these motions, as the new Bluefin fishing season commences on June 1, 2002.[2] Before the Court reaches the principal issue raised by this litigation, however, it addresses the threshold questions whether it has jurisdiction over the subject matter of the action, and whether the dispute is ripe for resolution at this time.

### A. Jurisdiction

■■■ The Association claims that the Secretary violated the APA by failing to conduct a proper rulemaking procedure subject to public notice and comment under 5 U.S.C. § 553 before extending the ban on spotter planes beyond the end of fiscal year 2001. Under the APA's judicial review provisions, this Court has authority to review an agency's failure to conduct the required notice and comment period. 5 U.S.C. §§ 702, 704, 706. The Service manages the Bluefin fisheries pursuant to rules and regulations authorized by the Atlantic Tunas Convention Act (the "Tuna Convention Act"), and subject to the APA judicial review provisions. See Atlantic Fish Spotters Ass'n v. Daley, 8 F.Supp.2d 113, 115–16 (D.Mass.1998) (Tauro, J.). This Court also has subject matter jurisdiction under the judicial review provision of the Magnuson Fishery Conservation

---

**2.** The Association filed a Complaint on June 7, 2001, seeking declaratory and injunctive relief on the basis that the Permit Condition was time limited to September 30, 2001, the end of the fiscal year, and that the inclusion of the Permit Condition was effectively the promulgation of a rule subject to the public notice and comment requirements of the APA and the RFA and that the Secretary's failure to follow these requirements invalidated the Permit Condition. Count One asserted the Secretary violated the APA; Count Two asserted the Secretary violated the RFA; and Count Three asked for declaratory relief limiting the Permit Condition to fiscal year 2001 and seeking an injunction against the Secretary from imposing the Permit Condition in the future.

The Association filed its original motion for summary judgment on August 31, 2001.

Shortly thereafter, the Association and the Defendant agreed to stay this action to participate in court-sponsored mediation discussions before Judge David Mazzone, along with the intervenors, General and Northshore. As of March 28, 2002, the mediation process had not resulted in any resolution, and the Association notified the Court of its intention to renew and refile its motion for summary judgment. The Secretary filed a cross-motion for summary judgment and an opposition on April 11, 2002. Oral argument on these motions and on the proposed intervenors' request to join the case was heard on May 1, 2002. The Court allowed General and Northshore to intervene pursuant to Rule 24(a) of the Federal Rules of Civil Procedure, and they filed their own cross motion for summary judgment.

and Management Act (the "Magnuson Act"), 16 U.S.C. § 1855(f). Declaratory judgment is warranted under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, once these jurisdictional bases are established, because there is here an actual controversy and the rights of the adverse parties will be affected by the judgment. Furthermore, were this Court to refrain from construing the statute, those seeking General and Harpoon Category permits, as well as the Secretary and other interested parties, would remain uncertain about whether the Secretary may legally extend the ban on spotter planes, which could impair commercial expectations and government enforcement. Because the new fishing season begins on June 1, 2002, this issue must be decided now.

## B. Ripeness

■ The Secretary argues that because the 2001 fishing season and all 2001 fishing permits have expired, and because the 2002 season does not begin until June 1, 2002, there is no actual controversy ripe for adjudication within the Court's jurisdiction. According to the Secretary, until the 2002 General and Harpoon fishing permit applications are promulgated and members of the Association apply for them and contest the inclusion of the spotter plane ban in these 2002 permits, their claims are premature. Def.'s Mem. at 4 n. 4.

There are two problems with the Secretary's analysis. First, the 2002 season is less than a month away and presumably the Service will issue permits very soon, if it has not already done so. In fact, one member of the Association has furnished the Court with evidence suggesting that while no General Category permits for 2002 have yet issued, Harpoon permits effective from May 22, 2001, until May 31, 2002, have issued, and are currently in

effect, which contain the Permit Condition banning spotter aircraft. *See* Pls.' Reply Ex. 2 ¶ 10 (Declaration of William C. Chaprales); Compl. Ex. A (permit for Chaprales's vessel *EzyDuzit*). It thus appears the start of the Bluefin season on June 1, 2002, is a regulatory construct only. It apparently does not relate to the actual availability of Bluefin in the North Atlantic. These fish have already been sighted and caught in the relevant fisheries involved in this case.

■ Second, even if it could be shown that no 2002 permit applications have yet been received, or the permits themselves drawn up or issued, the present dispute is a classic case of a controversy that is "capable of repetition, yet evading review." *S. Pac. Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911); *see also DeFunis v. Odegaard,* 416 U.S. 312, 318–19, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). So long as the permissibility of the ban on spotter planes remains in question, these parties are likely to dispute this issue year after year, as fishing seasons come and go, and Association members seek permits to fish Bluefin. *See generally, e.g.,* Pls.' Reply Ex. 2 (Declaration of William C. Chaprales). A "reasonable expectation" or "demonstrated probability" that the controversy would recur suffices to defeat a claim of mootness. *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (citing *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (per curiam)). The Secretary has made clear that he intends to extend the spotter plane ban and include it in the 2002 permits. The Association members will surely apply for permits and the plane spotters will be affected by their exclusion. Far from being moot, this case is a quintessential example of a controversy that is

capable of repetition yet evading review. This Court should, and will, resolve the case here and now.

## C. Standard of Review

In determining a motion for summary judgment, the court views the record "in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990). Summary judgment is appropriate only where the record, so viewed, "reveals that there is no genuine factual dispute and the moving party [is] entitled to judgment as a matter of law." *Siegal v. Am. Honda Motor Co.*, 921 F.2d 15, 17 (1st Cir.1990); Fed.R.Civ.P. 56(c). Nevertheless, Rule 56 mandates the entry of summary judgment against a party who fails to show a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

This Court reviews the particular actions of the Secretary in this case *de novo*. Under *Chevron USA Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), this Court need not defer to the Secretary's interpretation of the central issue in this case—whether the legal term "hereinafter" as it appeared in the appropriations rider was interpreted correctly. The Secretary has no special expertise requiring deference in this area, and statutory interpretation is a task to which the judiciary is particularly well suited. Furthermore, whether an agency is required to conduct proper rulemaking procedures as detailed in the APA, 5 U.S.C. § 553, is also a matter for this Court to decide. *Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227, 230–31 (D.C.Cir. 1992).

## D. The Legal Landscape Prior to Enactment of Section 634

The Secretary, acting through the Service (which is part of the National Oceanic and Atmospheric Administration), is responsible for managing and conserving marine fisheries resources, such as Bluefin tuna, under a statutory and regulatory framework that includes the Magnuson Act, 16 U.S.C. §§ 1801 *et seq.*, and the Tuna Convention Act, 16 U.S.C. §§ 971 *et seq.* The implementing regulations of these Acts allow the Secretary to require that a permit be obtained from the Secretary for any fishing vessel or operator of a vessel subject to the jurisdiction of the United States that wishes to fish for a species subject to management and conservation by the Secretary.[3] These permits are gear-specific; that is, they are issued based on the methods used to catch Bluefin. They include the following categories: Angling, General, Harpoon, Longline, Purse Seine, or Trap. 50 C.F.R.

3. The Magnuson Act authorizes the Secretary to manage and conserve "highly migratory" species, including Atlantic bluefin tuna, through the development of a "Fishery Management Plan" and the issuance of enforceable regulations to implement such a plan. 16 U.S.C. § 1854(g). The Act also authorizes the Secretary to require that any fishing vessel or operator of a fishing vessel wishing to fish for species under the plan obtain a permit from the Secretary. *Id.* § 1853(b). In addition, the Tuna Convention Act authorizes the Secretary to issue regulations under any Fishery Management Plan regulating Atlantic tunas that may be necessary to carry out the Act, including requiring fishermen to obtain a permit from the Secretary. *Id.* §§ 971d(c)(1)(A), 971d(c)(3)(I). Regulations implemented pursuant to the Secretary's authority require that a permit be obtained in order to fish for Atlantic bluefin tuna, 50 C.F.R. § 635.4(d), and make it illegal for any person to fish for, catch, or possess, retain or land a species such as Atlantic bluefin tuna without a valid vessel permit issued by the Service. *Id.* § 635.71(a)(2).

§ 635.4(d)(1). A vessel may harvest Bluefin only in compliance with the gear applicable to the permit category. *Id.* §§ 635.4(d)(1) (permits), 635.21(d)(1) (gear restrictions).

## E. Section 634

■■■■ Although Section 634 speaks directly to the Secretary's powers outlined above, it was enacted as a rider to a federal appropriations measure. This is significant, because the general rule is that a federal appropriations act applies only to the fiscal year in which it is passed. *E.g., Bldg. & Constr. Trades Dept., AFL–CIO v. Martin*, 961 F.2d 269, 273–74 (D.C.Cir. 1992). It is not treated as permanent legislation unless Congress explicitly indicates that it is intended to be permanent. *Id.* at 274. Federal law governing the budgetary process provides that "an appropriation in a regular, annual appropriation law may be construed to be permanent or available continuously only if the appropriation ... expressly provides that it is available after the fiscal year covered by the law in which it appears." 31 U.S.C. § 1301(c). This presumptive limitation can be overcome only when "its language clearly indicates that it is intended to be permanent." *Martin*, 961 F.2d at 274. In *Martin*, the court construed an appropriations rider to apply for only the fiscal year in which it was passed because "Congress used no words of futurity or permanency." *Id.* In this case, both sides agree that the presumptive fiscal year limitation can be overcome if the provision "uses language indicating futurity, *such as 'hereafter,'* or if the provision is of general character bearing no relation to the object of that appropriation." Gen. Accounting Office, *Princi-*

*ples of Federal Appropriations Law* 2–29 (1991) [hereinafter *GAO Principles* ], *available at* http://www.gao.gov. (emphasis added).

■■■■ What, then, does "hereinafter" mean as used in Section 634? The Association submits that, according to *Webster's Ninth Collegiate Dictionary* (9th ed.1989), "hereinafter" means, "In the following part of *this* writing or document," *id.* at 566, *quoted in* Pls.' Mem. at 7 (emphasis added). In contrast, "hereafter" is more generally thought to mean "in the future" without the same limitation to the text in which it appears. Both parties agree that "hereafter" is defined as "after this." Def.'s Mem. at 10–11 & n. 5; Pls.' Reply at 9–10. The General Accounting Office explains that "hereafter" is the best illustrative example of a word that gives the text of an appropriations bill force beyond its fiscal year. *GAO Principles, supra*, at 2–29. The Secretary contends that online dictionary searches and the *American Heritage Dictionary of the English Language* (1981) indicate that while "hereinafter" is generally taken to mean in a following part of the document, statement, book, or matter it appears in, it can also be a synonym for "hereafter," and is meant to have the secondary meaning "after this." Def.'s Mem. at 11 n. 5.

The Court need neither engage in a balancing test to ascertain which dictionary definition of hereinafter should control nor conduct its own sophisticated philological analysis to discern the one true meaning of "hereinafter" in all cases.[4] The act of statutory interpretation requires more than determining the precise

**4.** If the Court were forced to choose a definition of the word "hereinafter" in space and on its own, it would choose the definition proffered by the Association. Even the definitions cited by the Secretary acknowledge that

"hereinafter" is usually meant to refer only to a statement appearing later in the same writing, and most definitions omit any mention of a meaning synonymous with "hereafter."

meaning of a word out of context and plugging it back into the statute. Statutory phrases and individual words cannot be viewed in isolation. "Hereinafter" in Section 634 appears as part of a complete sentence. *See United States v. Morton*, 467 U.S. 822, 828, 104 S.Ct. 2769, 81 L.Ed.2d 680 (1984) ("We do not ... construe statutory phrases in isolation; we read statutes as a whole.... [W]ords ... must be read in light of the immediately following phrase.").

The Court deems it obvious when the word "hereinafter" is read in context, it was intended to indicate futurity. The phraseology is clear—"this [current act] or any previous act [prior acts],[5] or hereinafter [future acts]." Section 634 contains patent words of futurity. Discussions of the philological nature of "hereinafter" notwithstanding,[6] the intent of Congress is clear. *See generally Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 144–45 (2d Cir. 2002) (concluding that even where clear words of futurity were used, when clear intent of Congress was to the contrary words of futurity would be ignored).

■ There is a general presumption in statutory interpretation against construing a statute to contain superfluous or meaningless words. A court should "disfavor interpretations of statutes that render language superfluous." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). The phrase "this Act" immediately preceding the word "hereinafter" in Section 634 refers to any funds mentioned in that fiscal year 2001 Appropriations Act. Therefore, were "hereinafter" defined to mean "in the fol-

lowing part of (only) *this* writing or document," the term "this ... Act" would be completely superfluous and redundant. The Association would have the Court read Section 634 in the following manner: "None of the funds provided in this or any previous act, or hereinafter made available to the Department of Commerce ...."—reading out an entire phrase. "[T]his [Act]" clearly includes the entirety of the appropriations bill containing section 634. "Hereinafter," therefore, must mean something other than merely within the appropriations bill containing section 634—lest "this Act" be deemed mere surplusage. To deem "hereinafter" to be other than words of futurity stretches its meaning beyond credibility.

When presented with this problem, the Association argued the following: because this appropriations bill was an omnibus appropriations bill comprised of various sections each of which was previously an independent appropriations act, when reading the phrase "in this or any previous Act, or hereinafter"; "this" refers to "this section" (previously an independent act) of the 2001 appropriations act; "or any previous Act" refers to any previous section (previously independent acts); and "hereinafter" refers to all the sections that follow (previously future independent acts); all of which form the one whole, omnibus 2001 appropriations act. Under the Association's theory, "this or any previous Act," therefore, does not encompass the entire appropriations act, but only a portion of it, and the following "hereinafter" is thereby not rendered superfluous.

While the argument is clever, the Court rejects it. The term "Act" refers to one

---

5. The Court presumes "previous Acts" forecloses the possibility that funds appropriated in prior years, but unexpended, might be used to circumvent the prohibition.

6. Consider, for example, Section 160, which uses the phrase "hereafter in this subsection"

rather than "hereinafter." Pub.L. No. 106–553, app. A § 160(a)(1)(B). Congress is not fixated on the distinctions between "hereafter" and "hereinafter," and neither is this Court. *See also id.* § 165 ("hereafter in this paragraph").

cohesive and final piece of legislation—not constituent elements previously considered independently in committee. Almost all legislation is divided into different sections, without changing the general meaning of the term "Act." The introductory section of this appropriations act clearly uses "Act" in the sense of the *entire* appropriations bill.[7] Last, Congress could simply have used the term "this section" or "this section of the Act" if it had wished to convey the meaning the Association advocates. The meaning of the term "Act" in this appropriations measure clearly stands for the legislation in its entirety.

 It would have decided the issue beyond any doubt, of course, had Congress simply used the term "hereafter" instead of "hereinafter." The Association emphatically hammers home the points that Congress knew how to make the ban on spotter planes permanent, by using "hereafter," and that Congress would have done so had this been their intention. The Association notes that other sections of the appropriations bill meant to be permanent are phrased differently, such as Section 304(f): "This section shall be effective for *fiscal year 2001 and hereafter.*" (emphasis added). Given that "the usual canon [of statutory interpretation is] that when Congress uses different language in different sections of a statute, it does so inten-

tionally," *Harbor Gateway Commercial Property Owners' Ass'n v. EPA*, 167 F.3d 602, 606 (D.C.Cir.1999), and the GAO's statement that, in appropriations bills, "when Congress uses a different term, however closely related, it intends a different meaning," *GAO Principles, supra*, at 2–72, the Association argues Section 634 must be seen as temporary because permanent sections elsewhere in the bill were written differently.

This would be a compelling argument, except for the fact that Section 204 of this appropriations bill used the *exact* phrase found in section 634.[8] If the Association could somehow demonstrate that this section was also temporally limited to fiscal year 2001, then their argument would be more compelling. Section 204, however, is designed to prevent Department of Commerce funds from being used to pay expenses incurred by the unemployment insurance fund related to laid-off census workers (who technically fall within the Department of Commerce). Such as it is, this section emphatically points to the Secretary's view of the meaning of "hereinafter" as denoting permanent legislation when read in context. It would be absurd to suppose that Congress meant to protect Commerce funds from the unemployment fund this year, but not next year. Moreover, the text of Section 204 refers to "decennial censuses of population," indicat-

---

7. The title section of Public Law 106–553 refers to it as "An Act" and further reads:

> Section 1. (a) The provisions of the following bills of the 106th Congress are hereby enacted into law:
> (1) H.R. 5547, as introduced on October 25, 2000.
> (2) H.R. 5548, as introduced on October 25, 2000.
> (b) In publishing *this Act* . . . .

Pub.L. No. 106–553, § 1 (2000) (emphasis added). Given the use of the word "Act" in the title section of this vast appropriations bill, it is clear that "this ... Act" as used in

Section 634 comprises *all* of House Bills 5547 and 5548.

8. Section 204 reads: *"None of the funds provided in this or any previous Act, or hereinafter made available to the Department of Commerce,* shall be available to reimburse the Unemployment Trust Fund or any other fund or account of the Treasury to pay for any expenses authorized by section 8501 of title 5, United States Code, for services performed by individuals appointed to temporary positions within the Bureau of the Census for purposes relating to the decennial censuses of population." (emphasis added).

ing that Congress intended this provision to apply to multiple censuses—which occur every ten years. Sections 204 and 634 appear on their face to apply beyond fiscal year 2001.

▮ What ultimately decides the issue, however, is the fact that the *temporary* provisions of House Bill 5548 are drafted very differently than Section 634. In other words, the Secretary and the intervenors can point to an example in House Bill 5548 where permanent legislation was written in exactly the same way as Section 634 (Section 204), but they can *also* cite numerous examples of temporary provisions being written completely differently from Section 634.[9] When Congress meant to make sections of this 2001 appropriation act temporary, it frequently used the phrase, "None of the funds made available by this Act," full stop. (For examples of this, see Sections 203, 606, 608, 609 and 611). It also used the phrases "None of the funds made available to the Department of Justice in this Act" (Sections 620 and 622); and "None of the funds provided by this Act" (Section 616).[10] "It is well settled that where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Duncan v. Walker,* 533 U.S. 167, 173, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (internal quotation marks omitted). The Association has submitted no evidence whatsoever to rebut this presumption. In light of the numerous examples of temporary legislation in House Bill 5548, this Court rules that when Congress intended to limit funding to fiscal year 2001 in this Act, it did so with a completely different statutory approach than the one at issue in this case. Therefore, the Court's duty is clear. Had Congress meant Section 634 to be temporary, it would have written it in the same or in a substantially similar manner as it did other temporary provisions found in House Bill 5548. Because it did not, the Court must ascribe a different meaning to Section 634 than the one the Association advocates. Section 634 enacts permanent legislation.[11]

Because the Court regards Section 634 to be permanent legislation, it need not

9. Of course Congress used words of futurity properly in other sections of the appropriations bill, *see, e.g.,* Pub.L. No. 106–553, app. A § 135 ("and each February 1 thereafter"); *id.* app. A § 166 (18 U.S.C.A. § 4013 Note) ("Beginning in Fiscal Year 2000 and thereafter"); *id.* app. B § 110 ("Section 115 ... shall apply hereafter.").

10. This observation further rebuts the argument made by the Association that "Act" must be taken to mean "this section of this appropriations bill." It would be far too confusing if each provision cited above referred *only* to that particular section of this 2001 appropriations act. Were that true, spending of the type prohibited in one section could be authorized in other sections of the act, an absurd interpretation and result. "This act" means the entire act, not a part of it.

11. The Court notes that pursuant to general principles of appropriations law, "a provision may be construed as permanent if construing it as temporary would render the ₊provision meaningless or produce an absurd result." *GAO Principles, supra,* at 2–32. Were the Court to construe this section as limited to the 2001 fiscal year, an anomalous result would arise. The Bluefin fishing season begins in June and continues for an indefinite period, ostensibly until a predetermined number of Bluefin are caught. While it is possible that the Bluefin limit may be reached prior to September 30, 2001, it is by no means certain. In fact, this very scenario occurred— the 2001 Bluefin fishing season extended beyond September 30, 2001. Given the fact that Congress, at a bare minimum, intended to ban spotter plane use for the 2001 fishing season, adopting the Association's interpretation seems incongruous.

address the arguments of the Association regarding the APA and the RFA. The Association makes lengthy and detailed arguments in its submissions that substantive rules in the administrative law context are defined by their impact, their creation of new obligations, or their effect on existing legal rights.[12] *See generally Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C.Cir.1987) (distinguishing substantive rules, to which the notice and comment requirement applies, from interpretive rules, to which it does not). Because the Court has decided that Section 634 clearly states that this aspect of the 2001 appropriations act for the Department of Commerce was meant to apply beyond fiscal year 2001, however, what the Secretary did here was not rulemaking, but compliance with existing law. It is therefore unnecessary for this Court to decide whether the ban on spotter planes constitutes a substantive rule (though surely it would have had it simply been promulgated by the Service). Because the Permit Condition is not a rule under the APA, there is also no need to determine whether the Secretary was required to analyze the impact of the Permit Condition on small businesses and potentially less-harmful alternatives under the RFA.[13] Only actions that qualify as rulemaking under the APA which affect small businesses or small business concerns trigger the protections of the RFA.

### F. What Really Happened

It would be comforting if the legislative history of the 2001 Appropriations. Act, both formal and informal, confirmed the rather arid grammatical exercise the Court has just performed. Unfortunately, this is not the case.

The focused votes and actual words of relevant members of Congress are far from mandating the result the Court here reaches. While they do not prove the Association's point, they are at best equivocal. The initial congressional action concerning the use of spotter planes to harvest Bluefin was House Bill 1651, a bill to amend the Fisherman's Protective Act of 1967. This bill contained an amendment that specifically prohibited the use of spotter aircraft to assist Bluefin fishermen. 146 Cong. Rec. S5769–70 (daily ed. June 26, 2000); *see also* S.Rep. No. 106–302, at 6–7 (2000). The amended bill passed the Senate by unanimous consent on June 26, 2000. When this bill was returned to the House on July 25, 2000, Representative Jim Saxton moved to suspend the rules and pass the Senate amendment. *See* 146 Cong. Rec. H6855–56 (daily ed. July 25, 2000) (statement of Rep. Saxton). On a roll-call vote, the Senate-amended version of House Bill 1651 received 265 votes in favor and 154 votes against; the votes in favor were therefore 25 votes short of the two-thirds majority (290) required to pass a bill under suspension of the House rules. *Id.* H6855–56, H6884–85 (roll-call vote on Fisherman's Protective Act Amendments of 1999). This failure killed various Senate amendments to House Bill 1651, including the permanent ban on the use of spotter planes to harvest Bluefin.

---

12. The APA defines a substantive rule as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4).

13. *See* 5 U.S.C. § 603(a) (stating that an agency shall prepare an Initial Regulatory Flexibility Analysis, provide for notice and comment on it, and prepare a Final Regulatory Flexibility Analysis under 5 U.S.C. § 604, whenever the agency "is required by section 553 of this title, or any other law, to publish general notice of proposed rulemaking for any proposed rule.")

A resolution proposed by Representative Wayne Gilchrest excluded the permanent ban on spotter planes. The final version of the Fisherman's Protective Act that passed both Houses of Congress did not contain the permanent spotter plane ban. *See* H.R. Res. 579, 106th Cong. (1999). When this final version passed the House of Representatives, Representative Gilchrest acknowledged that the provision to ban spotter planes had been removed, stating: "This bill is virtually identical to the measure that overwhelmingly passed the House last year; however, *it does not include the extraneous measure added in the other body dealing with the harvest of bluefin tuna using spotter planes in the North Atlantic.*" 146 Cong. Rec. H7655–56 (daily ed. Sept. 18, 2000) (statement of Rep. Gilchrest and roll call vote) (emphasis added); *see also* Pls.' Statement of Facts ¶ 23.

In addition to this bill, spotter plane opponents made other unsuccessful attempts in the 106th Congress to address this issue through direct legislation. *See id.* ¶¶ 25–27. One such attempt was the inclusion by the Chair of the Senate Oceans and Fisheries Subcommittee, Olympia Snowe, of a provision, Section 361, banning spotter planes in House Bill 3417, the Pribilof [Alaska] Islands Transition Act (the "Transition Act"). *See* 146 Cong. Rec. S10,552–54 (daily ed. October 13, 2000). This ban on spotter planes was also removed prior to the enactment of the Transition Act into law. *See* Transition Act, Pub.L. No. 106–562, 114 Stat. 931 (2000).

Following these unsuccessful attempts to ban spotter planes through direct legislation, Section 634 was inserted into the appropriations bill for the Departments of Commerce, Justice and State for the fiscal year 2001. This appropriations bill, House Bill 5548, was passed on December 21, 2000. According to the Association, the ban on spotter planes was not contained in this appropriations bill when it first passed the House, but was inserted into the Conference Report, used to reconcile the House and Senate versions of this appropriations bill, and therefore constituted an "eleventh-hour" rider. Pls.' Statement of Facts ¶¶ 30–31. Defendant–Intervenors General and Northshore concede provision 634 was inserted as a rider, but submit that its inclusion was a result of their concerted efforts to lobby the Senate, specifically Senators Olympia Snowe of Maine, Judd Gregg of New Hampshire, and John Kerry of Massachusetts, to obtain bipartisan support for legislation banning the use of spotter planes. Intervenors' Mem. at 6 [Docket No. 43]. This rider, according to the defendant-intervenors, was a perfectly legal means by which they were finally successful in getting a permanent ban on spotter planes passed by Congress; provision 634, included in an appropriations bill, accomplished what a separate piece of legislation could not. One person surprised at this result will be Representative James V. Hansen, the new chairman of the House Committee on Resources, who on July 20, 2001, wrote to Representative Frank R. Wolf, Chairman of the House Appropriations Subcommittee on Commerce, Justice, State and Judiciary asking that further consideration of what he obviously believed was a temporary ban on spotter planes be referred to his authorizing committee rather than an appropriations committee. Letter from Representative James V. Hansen, Chairman, House Committee on Resources, to Representative Frank R. Wolf, Chairman, House Appropriations Subcommittee on Commerce, Justice, State and Judiciary (July 20, 2001) (on file with the Court).

Understandably, the Association is frustrated with the Secretary's maneuver to ban spotter planes permanently under the

authority of an appropriations bill. The particular history of attempts to ban the use of spotter planes in Bluefin fishing, not only before Congress, but also in judicial proceedings within this district, reveal that the end result reached in this case runs counter to every previous attempt by the Secretary and other interested parties to maintain a ban on spotter planes. When the Secretary tried to ban spotter planes through the administrative process, the Association successfully brought suit and had rules promulgated by the Secretary banning spotter planes in certain permit categories struck down. *Atlantic Fish Spotters*, 8 F.Supp.2d at 118 (rejecting the spotter ban permit condition as an arbitrary and capricious exercise of agency power). Following this decision, in 1999, when the government proposed a new regulation banning spotter planes, the Association initiated contempt proceedings against the Secretary and, after a hearing before the same court, the Secretary's designees elected not to promulgate the proposed regulation. The Secretary then turned to the Congress for help, but when Congress was unable to pass direct legislation that permanently banned the use of spotter planes when debating the Fisherman's Protective Act Amendments of 2000 in September of that year, Section 634 was inserted into a Conference Report to the appropriations bill, used to reconcile the House and Senate versions of the appropriations bill. Pls.' Statement of Facts ¶ 30. The Association naturally contends that the Secretary and the Service, unable to promulgate rules banning spotter planes on their own, turned to Congress, where proponents of the ban sneaked it through the back door of a fiscal limitation in an eleventh-hour rider attached to an appropriations bill. The Association believes, with some justification, that they had already won the fight prior to this rider.

## IV. CONCLUSION

It is said that hard cases make bad law. This is a hard case. One can easily observe that this Court, on a scant record, prefers the canon of statutory construction disfavoring surplusage over the canon disfavoring the growth of permanent legislation from appropriations riders. The difficulty of decision, however, in no way relieves the Court from making it. At bottom, the Court simply construes the language actually used by Congress in the context in which it is found.

Accordingly, the plaintiffs' motion for summary judgment [Docket No. 16] is DENIED, and the motion of the Secretary for summary judgment [Docket Nos. 38] is ALLOWED. By way of declaratory relief this Court rules that the 2002 General and Harpoon Category fishing permits to be issued by the Secretary through the Service may contain a ban on the use of spotter planes as a Permit Condition, as Section 634 is permanent legislation.

SO ORDERED.